**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1024**

PATRICK BAEHR; CHRISTINE BAEHR,

        Plaintiffs – Appellants,

     v.

THE CREIG NORTHROP TEAM, P.C.; CREIGHTON EDWARD NORTHROP,
III; LINDELL C. EAGAN; LAKEVIEW TITLE COMPANY, INC.,

        Defendants – Appellees,

     and

CARLA NORTHROP; LONG & FOSTER REAL ESTATE, INC.,

        Defendants.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.  (1:13-cv-00933-RDB)

Argued:  January 29, 2020                    Decided:  March 13, 2020

Before GREGORY, Chief Judge, KING, and QUATTLEBAUM, Circuit Judges.

Vacated and remanded for dismissal by published opinion.  Judge King wrote the opinion,
in which Chief Judge Gregory and Judge Quattlebaum joined.

**ARGUED:** Gregory T. Lawrence, CONTI FENN & LAWRENCE LLC, Baltimore, Maryland, for Appellants. Jay Norman Varon, FOLEY & LARDNER LLP, Washington, D.C., for Appellees. **ON BRIEF:** Michael J. Silvestri, CONTI FENN & LAWRENCE LLC, Baltimore, Maryland, for Appellants. Jennifer M. Keas, FOLEY & LARDNER LLP, Washington, D.C.; Timothy G. Casey, LAW OFFICE OF TIMOTHY G. CASEY, PA, Rockville, Maryland, for Appellees The Creig Northrop Team, P.C. and Creighton E. Northrop, III. Andrew C. White, William N. Sinclair, SILVERMAN THOMPSON SLUTKIN & WHITE LLC, Baltimore, Maryland, for Appellees Lindell C. Eagan and Lakeview Title Company, Inc.

KING, Circuit Judge:

This appeal arises from a purported kickback scheme orchestrated by the defendants, The Creig Northrop Team, P.C., Creighton Northrop, III (the "Northrop Defendants"), the Lakeview Title Company, Inc., and Lindell Eagan (the "Lakeview Defendants"). Homeowners Christine and Patrick Baehr (the "Baehrs"), as representatives of the putative class of plaintiffs, specify in their operative single-count complaint that the kickback scheme, in which the Lakeview Defendants paid the Northrop Defendants for marketing services that were actually illegal business referrals, deprived them and the other class members of "impartial and fair competition between settlement service[s] providers," in contravention of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq. See Baehr v. The Creig Northrop Team, P.C.*, No. 1:13-cv-00933, at ¶¶ 23, 41-47 (D. Md. Aug. 15, 2014), ECF No. 89 (the "Operative Complaint").

After conducting discovery, the Northrop and Lakeview Defendants jointly moved for summary judgment, arguing, inter alia, that the Baehrs had not established that they possessed Article III standing to sue. The district court thereafter awarded summary judgment to the defendants on that ground. More specifically, the court reasoned that the Baehrs had not suffered a concrete injury, and thus could not establish the necessary injury-in-fact for standing. *See Baehr v. The Creig Northrop Team, P.C.*, No. 1:13-cv-00933, slip op. at 21-22 (D. Md. Dec. 7, 2018), ECF No. 244 (the "Summary Judgment Opinion"). Alternatively, the Summary Judgment Opinion barred the Baehrs's claim under RESPA's statute of limitations based on their failure to establish that the claim was equitably tolled. *Id.* at 29. As explained below, we agree that the Baehrs lack standing to sue. Because a

3

federal court cannot exercise jurisdiction in the absence of standing, we vacate and remand for dismissal of this case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 102 (1998) (recognizing that standing "is part of the common understanding of what it takes to make a justiciable case" and that when jurisdiction does not exist, "the only function remaining to the court is that of announcing the fact and dismissing the cause" (internal quotation marks omitted)).

## I.

## A.

In July 2008, the Baehrs purchased a home in Glenwood, Maryland (the "Glenwood home").[1] They hired Maija Dykstra, a real estate agent who was a member of The Creig Northrop Team, P.C. ("The Northrop Team"), to represent them as buyers. The Northrop Team is comprised of real estate agents who independently provide real estate brokerage services under the brokerage license of Long & Foster Real Estate, Inc.[2] Creighton Northrop, III, a real estate agent, is the President of The Northrop Team. As President of The Northrop Team, Northrop splits real estate commissions with the other real estate agents who are independent-contractor members of the Team.

---

[1] Because the Baehrs appeal the district court's award of summary judgment to the defendants, we recite the facts in the light most favorable to the Baehrs, as the nonmoving party. *See Bauer v. Lynch*, 812 F.3d 340, 342 n.1 (4th Cir. 2016).

[2] Pursuant to Maryland law, licensed real estate agents must provide real estate brokerage services on behalf of a licensed real estate broker. *See* Md. Code, Bus. Occ. & Prof. § 17-310.

4

Pursuant to the Exclusive Right to Represent Buyer Agreement between the Baehrs and Long & Foster, Dykstra, as the Baehrs's real estate agent, located the Glenwood home and helped the Baehrs submit an offer to purchase it for $835,000. The sellers of the Glenwood home were represented by Northrop. After the Baehrs's offer was accepted, Dykstra informed them that the Lakeview Title Company would provide the settlement services necessary to complete the purchase of the Glenwood home. The Baehrs were not first-time home buyers and understood that they were free to procure settlement services from any provider thereof, but they "were satisfied" that Dykstra would select the settlement company. *See* J.A. 171.[3] In selecting the Lakeview Title Company, Dykstra informed the Baehrs that The Northrop Team "do[es] all [its] settlements at [the] Lakeview [Title Company]." *Id.* at 172. Despite shopping around for a mortgage lender, the Baehrs proceeded to settle on the Glenwood home with the Lakeview Title Company without investigating the Company or any other settlement services providers. The Baehrs did not inquire about the Lakeview Title Company's rates, quality of service, or affiliation with The Northrop Team because they had "contracted with a reputable company" — that is, The Northrop Team — and believed that The Northrop Team "would have [their] best interest." *Id.* at 173.

---

[3] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

The HUD-1 Settlement Statement prepared for the Baehrs's purchase of the Glenwood home listed, inter alia, the following fees for settlement services provided by the Lakeview Title Company:[4]

| | |
|---|---|
| Title Examination to the Lakeview Title Company: | $375 |
| Title Insurance Binder to the Lakeview Title Company: | $50 |
| Title Insurance to the Chicago Title Insurance Company: | $2,990[5] |
| Recording Services to the Lakeview Title Company: | $50 |

*See* J.A. 145. Other than the title insurance premium of $2,990, which was based on a rate filed with the State of Maryland, the Baehrs had paid similar fees for settlement services when purchasing a less-expensive home in Germantown in 2000. *Id.* at 219; *see also* Md. Code, Ins. §§ 11-403, 11-404, 11-407 (requiring that title insurance premiums be filed and approved by Maryland Insurance Administration and prohibiting deviation from filed rates). As they had for the Glenwood home, when purchasing the Germantown home, the Baehrs paid $375 for the title examination and $50 for the title insurance binder. *See* J.A. 219. The Baehrs also paid $75 for document preparation, $10 for notary fees, and $10 for copies. *Id.* In sum, the Baehrs paid $520 in discretionary fees to their settlement services provider for the Germantown home purchase. By contrast, the Baehrs paid only $425 in discretionary fees to the Lakeview Title Company for the Glenwood home purchase.

---

[4] The HUD-1 Settlement Statement is a standardized form created by the Department of Housing and Urban Development that lists all fees charged to the buyer and seller in a real estate settlement. *See What is a HUD-1 Settlement Statement?*, Consumer Fin. Prot. Bureau (Sept. 12, 2017), https://www.consumerfinance.gov/ask-cfpb/what-is-a-hud-1-settlement-statement-en-178/.

[5] The Lakeview Title Company collected the title insurance premium to split with the Chicago Title Insurance Company, the title insurance underwriter.

B.

1.

Almost five years after closing on the Glenwood home, the Baehrs received an unsolicited letter from a lawyer, G. Russell Donaldson, stating that they might have "a legal claim based on illegal kickbacks paid for the referral of [their] business to a title company that settled [their] purchase" of the Glenwood home. *See* J.A. 342. Shortly thereafter, the Baehrs retained Donaldson and the law firm Conti Fenn & Lawrence LLC to pursue a claim that they had been illegally referred to the Lakeview Title Company in contravention of RESPA. Before receiving Donaldson's letter, the Baehrs were satisfied with their experience purchasing the Glenwood home and the settlement services that the Lakview Title Company had provided. Indeed, even after learning of the purported kickback scheme, the Baehrs believed that the Lakeview Title Company was entitled to the fees it charged "for the work that [it] did." *Id.* at 208, 327.

Nevertheless, on March 27, 2013, the Baehrs, as representatives of the putative class of victims in these proceedings, filed suit in the District of Maryland against multiple defendants. *See Baehr v. The Creig Northrop Team, P.C.*, No. 1:13-cv-00933 (D. Md. Mar. 27, 2013), ECF No. 1 (the "Initial Complaint"). The single count of the Initial Complaint alleged that the Northrop and Lakeview Defendants, plus Long & Foster Real Estate, Inc. and Carla Northrop, violated RESPA's prohibition against giving or receiving kickbacks for settlement service referrals. *Id.* ¶ 1. That claim was predicated on a kickback scheme that spanned from 2000 to 2014, and that was perpetrated by the Northrop and Lakeview Defendants, Long & Foster, and Carla Northrop. The Initial Complaint alleged

7

that, between 2000 and 2007, the Lakeview Defendants paid illegal kickbacks for settlement service referrals under the guise of a sham employment agreement between the Lakeview Title Company and Carla Northrop. *Id.* ¶ 17. And the Initial Complaint alleged that, between 2008 and 2014, the Lakeview Defendants paid illegal kickbacks for settlement service referrals under the guise of a sham marketing agreement between the Lakeview Title Company and The Northrop Team. *Id.* ¶ 19. According to the Initial Complaint, as a result of the kickback scheme, the Baehrs and the putative class "were deprived of an impartial and fair competition between settlement service[s] providers in violation of RESPA." *Id.* ¶ 25.

2.

On January 29, 2014, the district court dismissed defendants Long & Foster and Carla Northrop with prejudice. *See Baehr v. The Creig Northrop Team, P.C.*, No. 1:13-cv-00933, slip op. at 16, 18 (D. Md. Jan. 29, 2014), ECF No. 58 (the "Dismissal Opinion"); *see also Baehr v. The Creig Northrop Team, P.C.*, No. 1:13-cv-00933, slip op. at 10 (D. Md. Jul. 24, 2014), ECF No. 84 (confirming that dismissals of Long & Foster and Carla Northrop were with prejudice). The court also granted the Baehrs's motion for class certification, but redefined the putative class thusly:

> All Maryland residents who retained Long & Foster Real Estate, Inc., Creighton Northrop, III, and [T]he Creig Northrop Team, P.C. to represent them in the purchase of a primary residence between January 1, 2008 to the present and settled on the purchase of their primary residence at Lakeview Title Company, Inc.

*See* Dismissal Opinion 31.[6]

Nearly seven months thereafter, on August 15, 2014, the Baehrs filed their Operative Complaint, which names as defendants the Northrop Defendants and the Lakeview Defendants. According to the Operative Complaint, the Northrop and Lakeview Defendants arranged for The Northrop Team to exclusively refer its clients to the Lakeview Title Company for settlement services. In exchange for The Northrop Team's efforts to steer clients to the Lakeview Title Company, the Lakeview Defendants paid the Northrop Defendants illegal kickbacks in the form of monthly cash payments of up to $12,000. Those illegal kickbacks were concealed using a sham marketing agreement between The Northrop Team and the Lakeview Title Company. *See* Operative Complaint ¶ 16. Pursuant to the marketing agreement, the Northrop Defendants designated the Lakeview Title Company as their exclusive settlement services provider and furnished the Lakeview Title Company with unspecified marketing services. The Lakeview Title Company agreed to remit monthly payments of $6,000 to the Northrop Defendants for those marketing services. Notwithstanding, the Northrop Defendants did not provide "any real joint marketing or services reasonably related to actual amounts paid" by the Lakeview Title Company to the Northrop Defendants. *Id.* ¶ 20. Rather, "the compensation was based on referrals and not for any marketing services rendered pursuant to the [m]arketing

---

[6] During oral argument of this appeal, the Baehrs's lawyer specified that the putative class consists of 1,088 members. *See* Oral Argument at 1:16, *Baehr v. The Creig Northrop Team, P.C.*, No. 19-1024 (4th Cir. Jan. 29, 2020), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.

9

[a]greement." *Id.* The Operative Complaint specifies that, under the marketing agreement, the Northrop Defendants have received over $500,000 from the Lakeview Defendants. *Id.* ¶ 19.

The Operative Complaint also alleges that the Northrop and Lakeview Defendants "actively concealed" the marketing agreement from their clients, including the Baehrs. *See* Operative Complaint ¶ 21. More specifically, the Lakeview Title Company provided each client with Long & Foster's Affiliated Business Disclosure that "purported to disclose" "business relationships (e.g., direct or indirect ownership interests, joint ventures and/or contractual relationships including marketing agreements and/or office leases)" between Long & Foster or "its subsidiaries or affiliates" and the entities specified therein. *Id.* (internal quotation marks omitted). Despite the marketing agreement between The Northrop Team and the Lakeview Title Company, the Lakeview Title Company was not among the entities specified in the Affiliated Business Disclosure. Because they "had no reason to doubt the [Affiliated Business Disclosure], and reasonably relied" on its "affirmative representation . . . that it included the title companies that Long & Foster, or its affiliates (including [T]he Northrop Team) had a financial relationship with," the Baehrs did not learn of the kickback scheme until March 16, 2013, when they were contacted by Donaldson. *Id.* ¶¶ 21-22.

Predicated on the kickback scheme, the Operative Complaint alleges that the Northrop and Lakeview Defendants deprived the Baehrs of "an impartial and fair competition between settlement service[s] providers in violation of RESPA," 12 U.S.C. § 2607(a). *See* Operative Complaint ¶ 23. To that end, the Operative Complaint seeks,

10

inter alia, statutory treble damages totaling more than $11,200,000. *See* 12 U.S.C. § 2607(d)(2) (authorizing damages equal to "three times" amount paid for settlement services provided in contravention of RESPA).

3.

Following discovery, on June 19, 2015, the Northrop and Lakeview Defendants jointly moved for summary judgment. The Northrop and Lakeview Defendants contended that summary judgment was warranted for two reasons. First, they asserted that the Baehrs's claim was not subject to equitable tolling and thus was barred by RESPA's one-year statute of limitations. Second, they asserted that the Baehrs had not suffered a concrete injury and thus lacked Article III standing to sue. On December 7, 2018, the district court granted the Northrop and Lakeview Defendants' summary judgment motion. The court concluded that the Baehrs lacked Article III standing because they were not overcharged for settlement services and had not otherwise suffered a concrete injury as necessary to establish injury-in-fact. *See* Summary Judgment Opinion 15-22. Alternatively, the court concluded that the Baehrs's claim was barred by RESPA's one-year statute of limitations because the Baehrs were not diligent in investigating The Northrop Team's affiliation with the Lakeview Title Company. *Id.* at 22-29. The Baehrs timely noted this appeal, and we possess jurisdiction under 28 U.S.C. § 1291.

II.

We review "de novo a district court's award of summary judgment, viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the

11

nonmoving party." *See United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 312 (4th Cir. 2018) (internal quotation marks omitted). An award of summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

## III.

Article III standing is "part and parcel of the constitutional mandate that the judicial power of the United States extend only to 'cases' and 'controversies.'" *See Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting U.S. Const. art. III, § 2). That constitutional mandate thus "requires a party invoking a federal court's jurisdiction to demonstrate standing." *See Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016). To that end, the "irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have suffered an injury-in-fact, which (2) must be causally connected to the conduct complained of, and that (3) will likely be redressed if the plaintiff prevails. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). As no case or controversy exists without injury-in-fact, it is the "[f]irst and foremost" element of Article III standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

In order to establish injury-in-fact, a plaintiff must show that she suffered "an invasion of a legally protected interest" — i.e., an injury — that is "concrete and particularized." *See Lujan*, 504 U.S. at 560. Crucially, concreteness and particularization are distinct requirements for injury-in-fact; the former is "quite different" from the latter. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). An injury is particularized if it

12

"affect[s] the plaintiff in a personal and individual way." *Id.* And an injury is concrete if it is "*de facto*" — that is, if it "actually exist[s]." *Id.*

Concrete injuries are not, however, limited to those injuries that result in tangible harm. *See Spokeo*, 136 S. Ct. at 1549. Indeed, injury-in-fact is often predicated on intangible harm. *See, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24-25 (1998) (informational injury); *Lujan*, 504 U.S. at 562-63 (aesthetic injury); *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (stigmatic injury). Notwithstanding, a statutory violation is not necessarily synonymous with an intangible harm that constitutes injury-in-fact. *See Spokeo*, 136 S. Ct. at 1549. For that reason, when a plaintiff sues to vindicate a statutory right, she still must establish that she suffered a concrete injury from the violation of that right. That is, a plaintiff cannot merely allege a "bare procedural violation, divorced from any concrete harm" and "satisfy the injury-in-fact requirement of Article III." *Id.*

The strictures of Article III standing are no less important in the context of class actions. *See Krakauer v. Dish Network, LLC*, 925 F.3d 643, 652 (4th Cir. 2019). In a class action, "we analyze standing based on the allegations of personal injury made by the named plaintiffs." *See Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018) (internal quotation marks omitted). A putative class thus cannot establish Article III standing "without a sufficient allegation of harm to the named plaintiff in particular." *Id.* (internal quotation marks and alteration omitted). In response to a summary judgment request, the named plaintiff is obliged to "set forth by affidavit or other evidence specific facts" that, when taken as true, establish each element of Article III standing. *See Lujan*, 504 U.S. at 561 (internal quotation marks omitted); *Judd*, 718 F.3d at 313.

13

On appeal, the Baehrs contend that the deprivation of impartial and fair competition between settlement services providers is a concrete injury under RESPA. Accordingly, the Baehrs maintain that "an overcharge is not necessary to have standing to bring [their] RESPA kickback claim." *See* Br. of Appellant 33. The Baehrs also advance three concrete injuries not alleged in the Operative Complaint. First, the Baehrs suggest that the Northrop Defendants owed fiduciary duties to remit to the Baehrs any kickback paid by the Lakeview Defendants and to provide impartial advice and advocacy. According to the Baehrs, because those two duties went unfulfilled, the otherwise reasonable fees that they paid to the Lakeview Title Company were an overcharge that caused them to suffer a concrete injury. Second, the Baehrs suggest that they suffered a concrete injury because the Northrop Defendants were unjustly enriched by the Baehrs's engagement of the Lakeview Title Company as their settlement services provider. Third, the Baehrs suggest that they suffered a concrete injury by paying for settlement services provided in contravention of RESPA.

A.

We first take up the Baehrs's contention that, through RESPA, Congress elevated the deprivation of impartial and fair competition between settlement services providers "to the status of [a] legally cognizable injur[y]." *See Lujan*, 504 U.S. at 578. Because injury-in-fact is a "hard floor" of Article III standing "that cannot be removed by statute," the question for us is whether the deprivation of impartial and fair competition between settlement services providers — an intangible harm — is nevertheless a concrete injury. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

14

1.

The Supreme Court's recent decision in *Spokeo* sets forth two considerations — historical practice and congressional judgment — that are "instructive" for determining whether an intangible harm constitutes a concrete injury. *See* 136 S. Ct. at 1549. The Baehrs have not identified a harm "traditionally . . . regarded as providing a basis for a lawsuit in English or American courts" that bears "a close relationship" to the deprivation of impartial and fair competition among settlement services providers. *Id.* Instead, the Baehrs's argument is predicated on Congress's inclusion of a cause of action in RESPA for damages sustained through settlement service referrals sullied by kickbacks.

Cognizant that a statutory cause of action is not a replacement for concrete injury, we recognize that a plaintiff suffers a concrete injury if she shows the harm stemming from the "defendant's statutory violation is the type of harm Congress sought to prevent when it enacted the statute." *See Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240-41 (4th Cir. 2019) (internal quotation marks omitted). Congress enacted RESPA to protect consumers from "certain abusive practices" that had resulted in "unnecessarily high settlement charges." *See* 12 U.S.C. § 2601(a); *see also Boulware v. Crossland Mortg. Corp.*, 291 F.3d 261, 267 (4th Cir. 2002) (observing that RESPA is "directed against" things that "increase the cost of real estate transactions"). Relevant here, those abusive practices include "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." *See* 12 U.S.C. § 2601(b)(2). Accordingly, as codified at 12 U.S.C. § 2607(a), RESPA provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding . . . that

15

business incident to or a part of a real estate settlement service . . . shall be referred to any person." *Id.* § 2607(a). RESPA's proscription against kickbacks is enforceable by federal agencies, state attorneys general and insurance commissioners, and private citizens. *Id.* § 2607(d)(1) (criminal penalties), (d)(2) (damages), (d)(4) (injunctive remedies). The cause of action for private citizens is limited, however, to claims for damages "equal to three times the amount of any charge paid" for settlement services rendered in contravention of § 2607(a). *Id.* § 2607(d)(2).

Plainly, in proscribing the payment of "formal kickbacks" for referrals of business to settlement services providers, Congress aimed to eliminate a practice that it believed interfered with the market for settlement services. *See Boulware*, 291 F.3d at 266, 268. To say that RESPA protects consumers from kickbacks' interference with the market for settlement services is not to say, however, that interference with the market is the harm to consumers that Congress sought to prevent through RESPA. Indeed, Congress specified in RESPA that by prohibiting kickbacks, the harm it sought to prevent is the increased costs that "tend" to result from kickbacks' interference with the market for settlement services. *See* 12 U.S.C. § 2601(b)(2).

To the extent that the fees charged by the Lakeview Title Company were reasonable, the Baehrs do not contend that they were harmed by being overcharged for settlement services. Instead, the Baehrs contend that they were harmed by being deprived of impartial and fair competition between settlement services providers. Because the deprivation of impartial and fair competition between settlement services providers is not the harm that Congress enacted § 2607(a) of RESPA to prevent, that alleged injury reduces to "a

16

statutory violation divorced from any real world effect." *See Dreher v. Experian Info. Sols.*, 856 F.3d 337, 346 (4th Cir. 2017). The upshot is that the deprivation of impartial and fair competition between settlement services providers — untethered from any evidence that the deprivation thereof increased settlement costs — is not a concrete injury under RESPA.

2.

The Baehrs resist the conclusion that the deprivation of impartial and fair competition is not a concrete injury under RESPA for two reasons. First, the Baehrs emphasize our passing observation in *Boulware* that a violation of § 2607(a) need not involve an overcharge to the consumer. *See* 291 F.3d at 266. Second, they point to out-of-circuit decisions, which purportedly compel the conclusion that the deprivation of impartial and fair competition between settlement services providers is a concrete injury under RESPA. We are not persuaded by either tack.

To begin, *Spokeo* made clear that a statutory violation does not always amount to a concrete injury. *See* 136 S. Ct. at 1549-50. Accordingly, we are satisfied that *Boulware* is not at odds with our conclusion that the mere deprivation of impartial and fair competition does not work concrete injury.[7]

---

[7] Recognizing that a violation of RESPA does not always result in the type of harm that Congress sought to prevent is not to say that kickbacks that do not cause an overcharge are insulated from liability under RESPA. After all, as explained above, RESPA's private cause of action is only one of several mechanisms for enforcing its proscription of kickbacks. That is, RESPA imposes criminal penalties and authorizes certain federal and state entities to sue to enjoin violations of § 2607(a). *See* 12 U.S.C. § 2607(d)(1), (d)(4).

17

As to the decisions of three other circuit courts upon which the Baehrs rely —

specifically, *Edwards v. First American Corp.*, *Alston v. Countrywide Financial Corp.*, and

*Carter v. Welles-Bowen Realty, Inc.* — we observe that those decisions preceded *Spokeo*.

*See* 610 F.3d 514 (9th Cir. 2010); 585 F.3d 753 (3d Cir. 2009); 553 F.3d 979 (6th Cir.

2009). Indeed, the Supreme Court explicitly recognized that *Spokeo* abrogated *Edwards*'

conclusion that a violation of § 2607(a) is a concrete injury regardless of any overcharge.

*See Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) (per curiam). Even if *Alston*'s and

*Carter*'s similar conclusions remain viable after *Spokeo* — a question that we do not

answer herein — those cases stem from circumstances different than the circumstances of

this appeal. That is, both decisions concern schemes facilitated by business ownership

arrangements that enabled the defendants to receive de facto kickbacks for referrals. *See*

*Alston*, 585 F.3d at 756-57; *Carter*, 553 F. 3d at 982 & n.1. As the Sixth Circuit explained

in *Carter*, following RESPA's enactment, Congress was particularly concerned that these

so-called affiliated business arrangements could be used to circumvent § 2607. *See* 553

F.3d at 987. By contrast, the Baehrs allege that the Lakeview Defendants were paying the

Northrop Defendants direct kickbacks under a sham marketing agreement. Insofar as the

conclusions in *Alston* and *Carter* were animated by Congress's concerns about the

affiliated business arrangements at issue therein, those conclusions are inapposite to this

appeal.

For similar reasons, the Baehrs find no footing in the District of Maryland's pre-

*Spokeo* decisions in *Robinson v. Fountainhead Title Group Corp.* and *Fangman v. Genuine*

*Title, LLC*. *See* 447 F. Supp. 2d 478 (D. Md. 2006); Civil Action No. RDB-14-0081, 2015

18

WL 8315704 (D. Md. Dec. 9, 2015). Like *Alston* and *Carter*, *Robinson* concerned a scheme involving affiliated business arrangements, in which the defendants received de facto kickbacks through their ownership stakes in sham settlement services providers. *See Robinson*, 447 F. Supp. 2d at 482. The Baehrs's reliance on *Robinson* is further undercut by the district court's recognition therein that the plaintiffs had alleged that they were overcharged for settlement services. *Id.* at 487-88. And in *Fangman*, the district court specifically applied *Edwards*' now-abrogated conclusion that a RESPA violation is an injury-in-fact before concluding that the plaintiffs had standing in part because they had alleged an overcharge. *See Fangman*, 2015 WL 8315704, at *3, *5.

Lastly, we emphasize that this record is devoid of evidence that the Baehrs were actually deprived of impartial and fair competition among settlement services providers. *See Lujan*, 504 U.S. at 561 (requiring plaintiff on summary judgment to establish standing by "set[ting] forth by affidavit or other evidence specific facts" (internal quotation marks omitted)). Besides parroting the Operative Complaint in deposition testimony and affidavits, the Baehrs set forth no evidence that impartial and fair competition between settlement services providers was even relevant to their decision to obtain settlement services from the Lakeview Title Company. *See* J.A. 208, 695, 698; *see also Dreher*, 856 F.3d at 347. On the contrary, the Baehrs did not investigate the Lakeview Title Company or other settlement services providers, were admittedly satisfied with the settlement services that they received, and continue to believe that the Lakeview Title Company deserved to be compensated for those services.

We therefore readily conclude that the Baehrs did not suffer any real-world harm, much less a concrete injury, from the deprivation of impartial and fair competition between settlement providers. Accordingly, the Baehrs's assertion that they were so deprived is insufficient to establish Article III standing.

B.

Because we conclude that the deprivation of fair and impartial competition among settlement providers is not a concrete injury under RESPA, we turn to the Baehrs's three novel theories of standing. We address — and reject — each of those theories seriatim.

1.

First, the Baehrs contend that the Northrop Defendants owed them fiduciary duties to return any kickback paid by the Lakeview Defendants to the Baehrs and to provide impartial advice and advocacy. The Baehrs assert that the Northrop Defendants' failure to fulfill those duties rendered the otherwise reasonable fees that they paid to the Lakeview Title Company an overcharge. This theory fails because the Baehrs have not established that the Northrop Defendants were their fiduciaries.

The Baehrs's contention that the Northrop Defendants were their fiduciaries rests solely on their boilerplate recitation that, under Maryland law, a real estate broker "stands in a fiduciary relationship" to her client. *See Wilkens Square LLLP v. W.C. Pinkard & Co.*, 984 A.2d 329, 336 (Md. Ct. Spec. App. 2009).[8] True enough. But Maryland law also

---

[8] A reported decision of the Maryland Court of Special Appeals is binding precedent unless overturned by the high court of Maryland. *See Archers Glen Partners, Inc. v.* (Continued)

20

specifies that a real estate broker "is an agent" for her "principal, with incumbent fiduciary duties to that person alone." *See Proctor v. Holden*, 540 A.2d 133, 142-43 (Md. Ct. Spec. App. 1988). Put succinctly, in a real estate transaction, a seller's representative does not owe fiduciary duties to the buyer. *See Lewis v. Long & Foster Real Estate, Inc.*, 584 A.2d 1325, 1329 (Md. Ct. Spec. App. 1991); *see also Yerkie v. Salisbury*, 287 A.2d 498, 500-01 (Md. 1972) ("[A] real estate broker is a fiduciary and when a seller employs a broker to sell [her] property [s]he bargains for the disinterested skill, diligence and zeal of the broker for [her] own exclusive benefit."). In the Baehrs's purchase of the Glenwood home, Northrop provided brokerage services to the sellers. As the sellers' representative, Northrop thus did not "stand[] in a fiduciary relationship" to the Baehrs for the purchase of the Glenwood home. *See Wilkens Square*, 984 A.2d at 336; *see also Herbert v. Saffell*, 877 F.2d 267, 274 (4th Cir. 1989) (explaining that, in Maryland, real estate agents "do not owe a fiduciary duty to prospective purchasers under most circumstances").

We are similarly unconvinced that The Northrop Team — a real estate team organized as a professional corporation — was the Baehrs's fiduciary in the purchase of the Glenwood home. The Baehrs have not established that an agency relationship existed between The Northrop Team and Dykstra — an independent consultant. *See Brooks v. Euclid Sys. Corp.*, 827 A.2d 887, 897 (Md. 2003) (setting forth three factors for determining whether agency relationship exists under Maryland law). Nor do the Baehrs

---

*Garner*, 933 A.2d 405, 424 (Md. Ct. Spec. App. 2007) (observing that a "reported decision" of the Maryland Court of Special Appeals "constitutes binding precedent").

21

identify any authority to support their assertion that, in Maryland, a professional corporation itself can owe fiduciary duties. Absent any such guiding authority, we leave that question of Maryland law to the Maryland courts.

In short, the Baehrs have not established that either Northrop or The Northrop Team were their fiduciaries in the Glenwood home purchase. *See Proctor*, 540 A.2d at 142 (explaining that, in Maryland, "the party alleging the agency has the burden of proving its existence and its nature and extent"). The Baehrs's fiduciary-duty theory of standing is thus unavailing.

2.

Second, invoking *Spokeo*'s instruction "to consider whether an alleged intangible harm has a close relationship to a *harm* that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," the Baehrs theorize that they suffered a concrete injury because the Northrop Defendants were unjustly enriched. *See Spokeo*, 136 S. Ct. at 1549 (emphasis added). Of course, the unjust enrichment cause of action is ensconced in our legal traditions. We are satisfied, however, to reject the Baehrs's unjust-enrichment theory because it mistakenly identifies a plaintiff's harm as providing the basis for an unjust enrichment action. Unlike a statutory cause of action that provides a damages remedy based on a plaintiff's loss, the touchstone of unjust enrichment is a defendant's gain. *See Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 352 (Md. 2007) (emphasizing that unjust enrichment "is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for [her] to keep" (internal quotation marks omitted)); Restatement (Third) of Restitution and Unjust Enrichment § 1

22

cmt. b (Am. Law Inst. 2011). That is, unjust enrichment provides a restitutionary remedy where a defendant receives a recognizable benefit that it would be inequitable for her to retain. *See Hill*, 936 A.2d at 351-52 (setting forth three-factor test for claim of unjust enrichment in Maryland).[9] Accordingly, in an action for unjust enrichment, a plaintiff need only establish that the defendant's gain was "without adequate legal basis." *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. b (Am. Law Inst. 2011). The plaintiff need not show that she suffered any harm from the defendant's gain. *Id.*

On this record, the Baehrs have not demonstrated that the benefit purportedly obtained by the Northrop Defendants — that is, a kickback — worked any harm other than the alleged violation of RESPA. Such a statutory violation, if proven, might give rise to liability in a lawsuit brought under the unjust enrichment cause of action. But because a plaintiff's harm has not "traditionally been regarded as providing" the basis for unjust enrichment actions, we are not persuaded that the Baehrs's bald allegation of unjust enrichment suffices to establish a concrete injury. *See Spokeo*, 136 S. Ct. at 1549. Indeed, concluding that a defendant's unjust enrichment always works a concrete injury to the plaintiff in an action for statutory damages runs counter to *Spokeo*'s mandate that "a bare

---

[9] Under Maryland law, unjust enrichment "may not be reduced neatly to a golden rule," but does consist of three elements: (1) "[a] benefit conferred upon the defendant by the plaintiff"; (2) "[a]n appreciation or knowledge by the defendant of the benefit"; and (3) "[t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *See Hill*, 936 A.2d at 351.

procedural violation, divorced from any concrete harm" cannot "satisfy the injury-in-fact requirement of Article III." *Id.* At bottom, the Baehrs's unjust-enrichment theory misapprehends the mischief that provides the basis for the unjust enrichment cause of action. Therefore, the unjust-enrichment theory also must fail.

3.

Third, the Baehrs contend that they suffered a concrete injury by paying for settlement services provided in contravention of RESPA. To support this unlawful-transaction theory, the Baehrs cite a single provision of the bankruptcy code, which authorizes damages where a bankruptcy petition preparer improperly renders legal advice. *See* 11 U.S.C. § 110(e)(2), (i)(1). We are satisfied to reject this under-developed theory because it is at odds with *Spokeo*'s mandate that a statutory violation "divorced from any concrete harm" is insufficient to establish injury-in-fact. *See Spokeo*, 136 S. Ct. at 1549. That is, we do not discern from the Baehrs's emphasis on their payment for settlement services any harm other than the Northrop and Lakeview Defendants' purported RESPA violation. The Baehrs received settlement services for which they paid a reasonable rate regardless of whether that payment was thereafter repackaged as a kickback. On this record, the harm suffered by the Baehrs under their unlawful-transaction theory thus reduces to the type of "bare procedural violation" that has long been insufficient for Article III standing. *Id.*; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing."). In the circumstances, we must reject the Baehrs's unlawful-transaction theory of standing.

24

## IV.

Pursuant to the foregoing, the Baehrs have not suffered a concrete injury. The Baehrs accordingly cannot establish injury-in-fact, and we therefore agree with the district court's determination that they lack Article III standing to sue. Because the court was obliged to dismiss upon making that determination, we vacate the summary judgment award and remand for dismissal. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 102 (1998).

*VACATED AND REMANDED*