**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1655

NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

------------------------------

STATE OF WASHINGTON; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF MAINE; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF OREGON; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA,

Amici Supporting Petitioner.

MERCED IRRIGATION DISTRICT; NATIONAL HYDROPOWER ASSOCIATION; NEVADA IRRIGATION DISTRICT; NORTHWEST HYDROELECTRIC ASSOCIATION; PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON; SOUTH FEATHER WATER AND POWER AGENCY; YUBA WATER AGENCY,

Amici Supporting Respondent.

No. 20-1671

PK VENTURES I LIMITED PARTNERSHIP,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

                          Respondent.

------------------------------

STATE OF WASHINGTON; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF MAINE; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF OREGON; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA,

                          Amici Supporting Petitioner.

MERCED IRRIGATION DISTRICT; NATIONAL HYDROPOWER ASSOCIATION; NEVADA IRRIGATION DISTRICT; NORTHWEST HYDROELECTRIC ASSOCIATION; PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON; SOUTH FEATHER WATER AND POWER AGENCY; YUBA WATER AGENCY,

                          Amici Supporting Respondent.

On Petitions for Review of an Order of the Federal Energy Regulatory Commission. (P-14858; P-4093)

Argued: May 6, 2021                                   Decided: July 2, 2021

Before KING and THACKER, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Petition for review in No. 20-1655 granted and petition for review in No. 20-1671 dismissed in part and denied in part by published opinion. Senior Judge Traxler wrote the opinion, in which Judge King and Judge Thacker joined.

**ARGUED:** David Montgomery Moore, EARTH & WATER LAW, LLC, Atlanta, Georgia; Asher Paris Spiller, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Petitioners. Susanna Y. Chu, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for Respondent. **ON BRIEF:**

Joshua H. Stein, Attorney General, Taylor H. Crabtree, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Petitioner North Carolina Department of Environmental Quality. David L. Morenoff, Acting General Counsel, Robert H. Solomon, Solicitor, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for Respondent. Robert W. Ferguson, Attorney General, Cindy Chang, Assistant Attorney General, Kelly T. Wood, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Seattle, Washington, for Amicus State of Washington. Xavier Becerra, Attorney General, Sarah E. Morrison, Supervising Deputy Attorney General, Tatiana K. Gaur, Deputy Attorney General, Catherina M. Wieman, Deputy Attorney General, Lani M. Maher, Deputy Attorney General, Environment Section, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Los Angeles, California, for Amicus State of California. William Tong, Attorney General, Jill Lacedonia, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Aaron M. Frey, Attorney General, Scott Boak, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Dana Nessel, Attorney General, Fadwa Hammoud, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Keith Ellison, Attorney General, Peter N. Surdo, Special Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, Saint Paul, Minnesota, for Amicus State of Minnesota. Gurbir S. Grewal, Attorney General, Kristina Miles, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Ellen F. Rosenblum, Attorney General, Paul Garrahan, Attorney-in-Charge, Natural Resources Section, OREGON DEPARTMENT OF JUSTICE, Salem, Oregon, for Amicus State of Oregon. Thomas J. Donovan, Jr., Attorney General, Laura B. Murphy, Assistant Attorney General, Environmental Protection Division, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Mark R. Herring, Attorney General, Donald D. Anderson, Deputy Attorney General, Paul Kugelman, Jr., Senior Assistant Attorney General, Section Chief, David C. Grandis, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Charles R. Sensiba, Washington, D.C., Andrea W. Wortzel, Richmond, Virginia, Angela J. Levin, TROUTMAN PEPPER HAMILTON SANDERS, LLP, San Francisco, California; Michael A. Swiger, Sharon L. White, VAN NESS FELDMAN, LLP, Washington, D.C., for Amici Merced Irrigation District, National Hydropower Association, Nevada Irrigation District, Northwest Hydroelectric Association, Public Utility District No. 1 of Snohomish County, Washington, South Feather Water and Power Agency, and Yuba Water Agency.

---

TRAXLER, Senior Circuit Judge:

In this case, we consider two petitions for review challenging the issuance of a license by the Federal Energy Regulatory Commission ("FERC") to McMahan Hydroelectric ("McMahan"), authorizing McMahan to operate the Bynum Hydroelectric Project (the "Project") on the Haw River in North Carolina. In Case No. 20-1655, the North Carolina Department of Environmental Quality ("NCDEQ") challenges FERC's determination that NCDEQ waived its rights under the Clean Water Act to issue a water quality certification for the Project. In Case No. 20-1671, PK Ventures I Limited Partnership ("PK Ventures") challenges FERC's jurisdiction to issue the license for the Project. As we will explain, in Case No. 20-1655, we grant NCDEQ's petition for review, vacate the license issued by FERC, and remand with instructions for FERC to re-issue the license to include the water-quality conditions imposed by NCDEQ. In Case No. 20-1671, we deny in part and dismiss in part PK Ventures' petition for review.

I.

The Federal Power Act ("FPA"), 16 U.S.C. §§ 791a-825r *et seq.*, created "a complete scheme of national regulation" to "promote the comprehensive development of the water resources of the Nation." *First Iowa Hydro-Elec. Coop. v. FPC*, 328 U.S. 152, 180 (1946). The FPA provides for "comprehensive control over those uses of the Nation's water resources in which the [f]ederal [g]overnment ha[s] a legitimate interest," including "navigation, irrigation, flood control, and, very prominently, hydroelectric power." *Fed. Power Comm'n v. Union Elec. Co.*, 381 U.S. 90, 98 (1965).

4

Under the FPA, a FERC-issued license is required for the construction, maintenance, and operation of any hydroelectric project located on "any of the navigable waters of the United States." 16 U.S.C. § 817(1). Since 1935, the statute has also required a FERC license for the construction of hydroelectric projects located on a non-navigable body of water that is nonetheless subject to Congress' authority under the Commerce Clause, if FERC determines that the project will affect interstate or foreign commerce. *See id.*; *Aquenergy Sys., Inc. v. FERC*, 857 F.2d 227, 228 (4th Cir. 1988) ("[FERC] had long had regulatory authority over [hydroelectric] projects in navigable waters, but until 1935, one undertaking any activity in non-navigable waters was not required to apply to [FERC] for anything."). The license requirement for projects on Commerce-Clause waters operates prospectively, applying only to projects where qualifying construction occurred after 1935. *See Aquenergy Sys.*, 857 F.2d at 228; *L.S. Starrett Co. v. FERC,* 650 F.3d 19, 23 (1st Cir. 2011).

Section 401 of the Clean Water Act ("CWA") requires an applicant seeking federal licensing of a project that would result in a discharge to navigable waters to obtain a certification from the appropriate state agency verifying that the planned project complies with state water quality requirements. *See* 33 U.S.C. § 1341(a)(1). If the state concludes that conditions on the operation of the project are necessary to ensure compliance with its water quality standards, those conditions must be set out in the § 401 certification, and the federal licensing agency must incorporate the state's conditions into the federal license. *See id.* § 1341(d). A state waives its certification authority if it "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one

5

year) after receipt of such request." *Id.* § 1341(a)(l). "No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided . . . . No license or permit shall be granted if certification has been denied by the State." *Id.*

## II.

The Project consists of a dam, powerhouse, and related facilities in Chatham County, North Carolina. The 10-feet high, 900-feet long masonry dam was built in 1874. The Project converted from a mechanical operation to an electrical hydropower operation in 1940, when an electrical turbine was installed.

In 1985, FERC issued a 30-year license for operation for the Project; the license was transferred to Bynum Hydro Company in 1986. Petitioner PK Ventures subsequently acquired the Project from Bynum, but the license was never formally transferred to PK Ventures. J.A. 287. The Project last generated electricity more than a decade ago.

Anticipating the 2015 expiration of the license, PK Ventures in 2010 filed a notice of intent to apply for relicensing of the Project. PK Ventures did not follow through, however, and never filed a license application for the Project with FERC. On March 30, 2015, McMahan filed an application for a license to operate the Project.

While McMahan's application was pending, FERC determined that Bynum Hydro had been dissolved, and FERC transferred the Project license to PK Ventures. PK Ventures sought rehearing, arguing that it was not the licensee of the Project and asking FERC to rescind the transfer. FERC granted rehearing and rescinded the transfer, explaining that "it is in the public interest to allow the license to expire while [FERC] considers

6

McMahan's application." J.A. 290. FERC's order prohibited PK Ventures from operating the Project or filing its own application while McMahan's application was under review. *See id.* ("[B]ecause PK Ventures failed to file a timely application after being made aware of the filing deadline . . . , PK Ventures is barred from filing a license or exemption application for this project while the Commission reviews McMahan's license application. In addition, PK Ventures may not operate the project without Commission authorization.") (footnotes omitted).

As required by the CWA, McMahan sought a § 401 water-quality certification from NCDEQ, filing its application on March 3, 2017. On April 26, 2017, NCDEQ sent a letter directing McMahan to submit a water-quality monitoring plan and giving guidance as to what should be included in the plan. NCDEQ also asked McMahan to provide it with FERC's environmental assessment[1] ("EA") of the Project.

On December 21, 2017, McMahan emailed a water-quality monitoring plan to NCDEQ. In the email, McMahan also asked to "discuss refiling" its application since FERC still had not completed the Project's EA. J.A. 524. NCDEQ responded to McMahan on January 3, 2018. NCDEQ acknowledged receipt of the water quality monitoring plan and told McMahan that "[t]o refile your application, you will need to send a letter stating

---

[1] Under the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., "[federal] agencies considering certain projects must evaluate whether the project would have a significant impact on the environment by preparing an Environmental Assessment. . . . If the project would have a significant impact, the agency must prepare an Environmental Impact Statement." *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 218 (4th Cir. 2019).

7

that you would like to withdraw your application and reapply prior to March 3, 201[8]. We do not charge an additional review fee when the delay is beyond the applicant's control as in your situation." J.A. 537. On February 20, 2018, McMahan sent NCDEQ a letter "withdrawing its current application, and re-applying for the 401 Certification." J.A. 311.

FERC issued the EA on October 25, 2018. After reviewing the EA, NCDEQ staff met with McMahan on December 19, 2018. NCDEQ staff told McMahan that it would not be able to issue a § 401 certification by February 20, 2019 (one year after McMahan withdrew and resubmitted his certification application), in part because of the time frames imposed by the statutorily mandated public-notice-and-comment process.[2] At that meeting, McMahan informed NCDEQ that it intended to withdraw and resubmit its application before expiration of the one-year review period. NCDEQ sent McMahan written comments about the water-quality monitoring plan the day after the meeting.

On January 18, 2019, McMahan submitted a revised water-quality monitoring plan. NCDEQ responded on February 7, 2019, stating that the agency had "no further comment/question on the revised monitoring plan. However, please remember to send Karen a request to withdraw and reapply (I think the deadline is by February 20th)." J.A. 547. On February 11, 2019, McMahan withdrew and resubmitted its § 401 application.

---

[2] The notice-and-comment period could not have begun before NCDEQ reviewed the EA. As explained in an affidavit from NCDEQ's supervisor of the § 401 certifications, the environmental assessment "serves as a critical component of any 401 application for a federally licensed hydroelectric project." J.A. 504. Because "agencies must consider reasonable alternatives, . . . the configuration of a project may change as a result of the EA process. The EA also contains an analysis of environmental impacts that inform NCDEQ's analysis of the potential impacts on waters of the State." *Id.*

McMahan asked NCDEQ to put the application on hold again on April 19, 2019, and then asked NCDEQ to resume review on July 23, 2019.

NCDEQ issued McMahan a § 401 certification for the Project on September 20, 2019. The § 401 certification included several conditions NCDEQ deemed necessary to ensure compliance with North Carolina's water quality standards.

On the same day that NCDEQ issued the certification, FERC issued an order (the "License Order") granting McMahan a 40-year license to operate the Project. *See* J.A. 429-79. In the License Order, FERC concluded that NCDEQ had waived its authority to issue a § 401 certification. FERC determined that the statutory review period began on March 3, 2017, when McMahan filed its initial application for § 401 certification, and that "the one-year clock" was not restarted by McMahan's withdrawals and resubmissions of its application. J.A. 438-39. Relying on *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019), FERC explained that an "ongoing agreement" between an applicant and the state agency to repeatedly withdraw and resubmit a § 401 certification application over a period exceeding a year amounts to a waiver of the State's certification authority. J.A. 439. In FERC's view, "the record shows that North Carolina DEQ and McMahan Hydro agreed to a withdrawal and refiling process (and, *indeed, that the state agency directed that activity*), such that North Carolina DEQ has delayed the licensing of the Bynum Project." *Id.* (emphasis added). FERC also concluded that the one-year review-period was not tolled by NCDEQ's requests for additional information, noting that a contrary rule "could encourage the states to ask applicants to provide additional data in order to give themselves

9

more time to process certification requests, in contravention of Congress' intent." *Id.* at 440 n.43.

NCDEQ filed a rehearing request with FERC, seeking a rescission of the waiver determination and asking FERC to incorporate the conditions of the § 401 certification into the License Order. NCDEQ informed McMahan of its intent to seek rehearing, and McMahan did not oppose it. In support of rehearing, NCDEQ submitted an affidavit from Karen Higgins, who was in charge of the division responsible for issuing § 401 certifications. The affidavit detailed the agency's interactions with McMahan and explained that in every instance it was McMahan who sought to withdraw his application. Copies of the correspondence between the parties and other relevant documents were included as exhibits to the affidavit.

FERC denied NCDEQ's rehearing request. *See* J.A. 633-58. In its order, FERC acknowledged that the first withdrawal "was initiated by McMahan." J.A. 645. Nonetheless, FERC stated that it still was

> not persuaded that this was a unilateral action by the applicant. North Carolina DEQ instructed McMahan Hydro to send a letter indicating that McMahan Hydro would like to withdraw and reapply and also indicated that no additional review fee was necessary. McMahan Hydro's February 20, 2018 withdrawal-and-resubmittal letter did not convey any substantive information to North Carolina DEQ, but merely withdrew and resubmitted the very same water quality certification request that had been pending before North Carolina DEQ on that date.

J.A. 645 (footnote omitted). FERC concluded that McMahan and NCDEQ had engaged in a "coordinated withdrawal and resubmission scheme," J.A. 646 (internal quotation marks omitted), for "the purpose of avoiding waiver," J.A. 648, such that a waiver finding was

10

proper under *Hoopa Valley*. As to Higgins' affidavit, which FERC described as only addressing whether there was a formal agreement between NCDEQ and McMahan, FERC dismissed it as "unconvincing and irrelevant." J.A. 649. FERC explained that whether or not there was a formal agreement, NCDEQ's "coordination" with McMahan was enough to establish waiver. J.A. 649.

PK Ventures also filed a request for rehearing with FERC, arguing, *inter alia*, that FERC lacked jurisdiction over the Project because the Haw River is not navigable and the Project does not affect interstate commerce. FERC determined that it properly exercised jurisdiction and denied PK Venture's petition for rehearing. NCDEQ and PK Ventures both petition this court for review of FERC's orders.

### III.

We turn first to Case No. 20-1671, the petition for review filed by PK Ventures. PK Ventures contends that FERC lacked jurisdiction under the FPA to issue the license to McMahan and that McMahan's § 401 application to NCDEQ was not valid under North Carolina law because McMahan was not the owner of the Project.

### A.

Before addressing the merits, we first consider FERC's contention that PK Ventures lacks standing to challenge the License Order. *See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 680 (4th Cir. 2020) ("Because standing implicates our Article III power to hear the case, we must resolve it first.").

The FPA authorizes a party "aggrieved" by a FERC order to seek judicial review. 16 U.S.C. § 825*l*(b). "Parties are aggrieved under the Federal Power Act if they satisfy

11

both the constitutional and prudential requirements for standing. The requirement of aggrievement serves to distinguish a person with a direct stake in the outcome of a litigation from a person with a mere interest in the problem." *New York Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 586 (D.C. Cir. 2011) (citations and internal quotation marks omitted); *see U.S. ex rel. Chapman v. Fed. Power Comm'n*, 191 F.2d 796, 800 (4th Cir. 1951) (explaining that to have standing under § 825*l*, "some right or interest of a complaining party must be invaded to justify him in asking relief in court"), *aff'd*, 345 U.S. 153 (1953).

"[T]he irreducible constitutional minimum of standing contains three elements: (1) the [litigant] must have suffered an injury-in-fact, which (2) must be causally connected to the conduct complained of, and that (3) will likely be redressed if the [litigant] prevails." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir.) (internal quotation marks omitted), *cert. denied*, 141 S. Ct. 373 (2020).

In our view, PK Ventures' ownership of the Project gives it a direct stake in the outcome of the licensing proceeding and satisfies the requirements for Article III standing. If FERC does not have jurisdiction over the Project, as PK Ventures contends, PK Ventures would be free to operate the Project as it sees fit, without a FERC license or oversight. But if FERC does have jurisdiction and the license to McMahan stands, the FPA authorizes McMahan to take title to the Project from PK Ventures through eminent domain. *See* 16 U.S.C. § 814 ("When any licensee cannot acquire by contract . . . the right to use . . . the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, . . . it may acquire the same by the exercise of the right of eminent domain . . . ."). Because the

12

issuance of the license to McMahan threatens PK Ventures' continuing use and ownership of the Project, PK Ventures has suffered a concrete injury-in-fact that would be redressed were we to rule in its favor. We therefore conclude that PK Ventures is an aggrieved party with standing to challenge FERC's issuance of the License Order.

B.

We turn now to PK Ventures' challenges to FERC's jurisdiction over the Project. As previously noted, a FERC license is required to operate a hydroelectric project that affects interstate commerce and is located on a body of water "over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States," 16 U.S.C. § 817(1), as long as some "construction" of the project occurred after 1935, *see Aquenergy Sys.*, 957 F.2d at 228. In its petition for review, PK Ventures contends FERC lacks jurisdiction to license the Project because the Haw River is not navigable, the dam was built before 1935, and the Project does not affect interstate commerce. We disagree.

Whether or not the Haw River is itself navigable, it is a tributary of the Cape Fear River, which itself is a navigable waterway. *See J&T Hydro Co.*, 50 FERC ¶ 62079, 63082 at n.4 (1990). Accordingly, the Haw River qualifies as a body of water over which Congress has Commerce Clause authority. *See L.S. Starrett Co.*, 650 F.3d at 24 ("[T]he headwaters and tributaries of navigable waters are Commerce Clause streams.") (internal quotation marks and alterations omitted).

Moreover, the record supports FERC's determination that qualifying "construction" of the Project occurred after 1935. Although the dam was built in the late 1800s, a turbine

13

was added in 1940 that converted "a mechanical energy facility with no hydroelectric generation to a hydroelectric project with 600 kilowatts . . . of new hydroelectric generating capacity." J.A. 637. That is enough to satisfy the requirement of post-1935 construction. *See Aquenergy Sys.*, 857 F.2d at 229 ("Congress did not intend § [817] to apply to ordinary maintenance, repair and reconstruction activity. . . . At the same time, the statute could hardly be construed to authorize work which would substantially enlarge or change an existing plant."); *accord L.S. Starrett Co.*, 650 F.3d at 26-27 (concluding that post-1935 construction work that increased the project's power-generating capacity satisfied the requirements of § 817); *Puget Sound Power & Light Co. v. FPC*, 557 F.2d 1311, 1316 (9th Cir. 1977) (project enlargement resulting in increased generating capacity satisfies construction requirement).

We also reject PK Ventures' claim that FERC lacks jurisdiction because the Project has no effect on interstate commerce given that it has not operated for over a decade and is not presently producing electricity. As FERC explained, it is the *proposed use* of the Project that is relevant to FERC's licensing jurisdiction, not the manner in which the unlicensed Project is presently being used. *See* 16 U.S.C. § 817(1) (requiring license for proposed project on non-navigable Commerce Clause waters if FERC's investigation of the "*proposed construction*" shows that "the interests of interstate or foreign commerce *would be affected* by such *proposed construction*") (emphasis added).

Because FERC properly exercised jurisdiction over the Project, we deny this portion of PK Ventures' petition for review.

C.

14

Finally, we turn to PK Ventures' claim that McMahan's § 401 applications were not valid under North Carolina law.

When McMahan filed its § 401 applications, North Carolina law provided that a "valid" § 401 application must be signed by "a responsible officer of the company, municipal official, partner or owner," and that the signature "certifies that the applicant has title to the property, has been authorized by the owner to apply for certification or is a public entity and has the power of eminent domain." 15A N.C. Admin. Code 2H.0502(f) (2018).[3] Because McMahan is not the owner of the Project, PK Ventures contends that McMahan's applications for a § 401 certification were not valid and that the certification issued by NCDEQ is likewise not valid.

This claim is, at bottom, a challenge to the propriety of actions taken by NCDEQ. This court, however, is only authorized to review the actions of FERC, s*ee* 16 U.S.C. § 825*l*(b), and the FPA does not require applicants for a FERC license to own the property involved in the proposed project. Whether NCDEQ erred by accepting an application filed by a non-owner is a question of state law for the state courts; we have no authority to weigh in on the issue or invalidate McMahan's license on that basis. *See City of Tacoma v. FERC*, 460 F.3d 53, 67 (D.C. Cir. 2006) ("In most cases, if a party seeks to challenge a state certification issued pursuant to section 401, it must do so through the state courts."); *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1056 (1st Cir. 1982)

---

[3] By the time NCDEQ issued the § 401 certification, a new version of the regulation omitting the owner-signature requirement had taken effect. *See* 15A N.C. Admin. Code 2H.0502(f) (effective June 1, 2019).

("The courts have consistently . . . rul[ed] that the proper forum to review the appropriateness of a state's certification is the state court, and that federal courts and agencies are without authority to review the validity of requirements imposed under state law or in a state's certification."). Because we lack jurisdiction to review NCDEQ's acceptance of McMahan's § 401 applications, we dismiss that portion of PK Ventures' petition for review.

IV.

We now turn to the petition for review filed by NCDEQ in Case No. 20-1655. NCDEQ argues that FERC's approach to the question of waiver is inconsistent with the plain language of the CWA and with the purpose of the CWA. Alternatively, NCDEQ contends that even if FERC's understanding of the statute is correct, the waiver finding must be set aside because FERC's key factual findings are not supported by substantial evidence.

Our narrow scope of review permits this court to set aside the License Order if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence." *Appomattox River Water Auth. v. FERC*, 736 F.2d 1000, 1002 (4th Cir. 1984) (citation omitted); *see* 5 U.S.C. § 706(2)(A); 16 U.S.C. § 825*l*(b). Because FERC does not administer the Clean Water Act, we owe no deference to its interpretation of § 401. *See AES Sparrows Point LNG v. Wilson*, 589 F.3d 721, 730 (4th Cir. 2009) (declining to defer to FERC regulation addressing § 401 because "FERC is not charged in any manner with administering the Clean Water Act"); *Ala. Rivers All. v. FERC*, 325 F.3d 290, 296–97 (D.C. Cir. 2003) ("The Commission's interpretation of the CWA is

16

not entitled to the usual judicial deference, however, because the Environmental Protection Agency (EPA)—and not FERC—is charged with administering the statute.").

A.

Under the CWA, a State waives its water-quality certification authority if it "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request." 33 U.S.C. § 1341(a)(1).[4] On February 20, 2019, McMahan withdrew and resubmitted its application; NCDEQ granted that application seven months later on September 20, 2019. FERC nonetheless determined that NCDEQ waived its certification authority because it failed to timely act on McMahan's *initial* application filed on March 3, 2017. In FERC's view, McMahan's withdrawal and refiling of that application did not re-start the review clock because NCDEQ coordinated with McMahan on the withdrawal-and-resubmittal for the purpose of evading § 401's one-year review period.

In its petition for review, NCDEQ argues that FERC's approach to the waiver question is inconsistent with the plain language of the CWA. NCDEQ asserts that because the period for state review begins upon "receipt of such request," 33 U.S.C. § 1341(a), the

---

[4]     In *AES Sparrows Point LNG v. Wilson*, 589 F.3d 721 (4th Cir. 2009), this court held that § 401 was ambiguous as to whether the review period began when the application was initially filed or when the application was finally complete, and we gave *Chevron* deference to a regulation of the Army Corps of Engineers providing that the period started when the Corps deemed the application to be complete. *See id.* at 729-30. The holding of *Sparrows Point* has no application here, as *Sparrows Point* did not involve withdrawn and resubmitted applications, and NCDEQ does not contend that McMahan's initial application was incomplete.

17

statutory waiver provision is "request-specific," in that it applies only "to the request that is actually pending and awaiting action from the agency"; once an application is withdrawn, there is nothing pending before the agency, and therefore nothing for the agency to act on. *Brief of NCDEQ* at 28. Accordingly, NCDEQ argues that when McMahan withdrew the March 2017 application and then the February 2018 application, those applications were no longer pending before the agency and have no effect on the question of waiver. NCDEQ timely acted on the application that McMahan filed on February 11, 2019, by issuing the § 401 certification (with conditions) on September 20, 2019. Because NCDEQ neither failed nor refused to act upon a pending certification request, NCDEQ contends that FERC's waiver determination is inconsistent with the plain language of the statute. NCDEQ argues that *Hoopa Valley*'s holding is narrow and based on specific facts wholly absent from this case and that FERC therefore erred by relying on *Hoopa Valley* to disregard the effect of the application withdrawals.

As NCDEQ contends, the language of § 401 makes the one-year review period specific to each application request—the state agency must act on an application within a year of the filing of that application. *See Hoopa Valley*, 913 F.3d at 1104 ("Implicit in the statute's reference 'to act on a *request* for certification,' the provision applies to a specific request. This text cannot be reasonably interpreted to mean that the period of review for one request affects that of any other request."). Ordinarily, then, the applicant's withdrawal of its certification request would end the agency's obligation to review that application, and the prior withdrawal would have no effect on the review period available for a subsequent application. When the new application comes weeks or months after the

18

withdrawal and returns in better developed, more complete form, it seems clear that the one-year review clock should restart upon receipt of the new application. The issue becomes a bit murkier in cases like this one, involving the withdrawal and immediate resubmission of the same application. FERC relies on *Hoopa Valley* to explain why McMahan's withdrawal of its applications did not restart the one-year review clock.

*Hoopa Valley* involved the Klamath Hydroelectric Project, a series of dams located on the Klamath River in California and Oregon. In 2004, PacifiCorp sought relicensing of the project, proposing to relicense only the upper dams and to decommission the others. *See Hoopa Valley*, 913 F.3d at 1101. As required by § 401, PacifiCorp also sought water-quality certifications from Oregon and California. In 2008, a consortium of interested parties began settlement negotiations to resolve the procedures and the risks associated with the dams' decommissioning. By that time, the § 401 certification was the only requirement of the relicensing process that had not been satisfied. The settlement negotiations culminated in a written contract that targeted a decommission date of 2020 and placed various environmental and financial obligations on PacifiCorp. The settlement contract included an agreement to defer the § 401 one-year review period through a process where PacifiCorp would annually withdraw and resubmit the water quality certification requests just before the expiration of the one-year review period. *See id.*

In 2012, the Hoopa Valley Tribe, which was not a party to the settlement agreement, sought a declaratory order from FERC that PacifiCorp had failed to diligently prosecute its application and that the States had waived their certification authority. FERC denied the petition, and the Tribe sought review by the D.C. Circuit. *See id.* at 1102. The court held

19

that the states had waived their § 401 certification authority by entering into the agreement

with PacifiCorp:

> The record does not indicate that PacifiCorp withdrew its request and submitted a wholly new one in its place, and therefore, we decline to resolve the legitimacy of such an arrangement. We likewise need not determine how different a request must be to constitute a "new request" such that it restarts the one-year clock. This case presents the set of facts in which a licensee entered a written agreement with the reviewing states to delay water quality certification. PacifiCorp's withdrawals-and-resubmissions were not just similar requests, they were not new requests at all. The [settlement contract] makes clear that PacifiCorp never intended to submit a "new request." Indeed, as agreed, before each calendar year had passed, PacifiCorp sent a letter indicating withdrawal of its water quality certification request and resubmission of the very same request . . . in the same one-page letter . . . for more than a decade. Such an arrangement does not exploit a statutory loophole; it serves to circumvent a congressionally granted authority over the licensing, conditioning, and developing of a hydropower project.

> While the statute does not define "failure to act" or "refusal to act," the states' efforts, as dictated by the [settlement contract], constitute such failure and refusal within the plain meaning of these phrases. *Section 401 requires state action within a reasonable period of time, not to exceed one year. California and Oregon's deliberate and contractual idleness defies this requirement.* By shelving water quality certifications, the states usurp FERC's control over whether and when a federal license will issue. Thus, if allowed, the withdrawal-and-resubmission scheme could be used to indefinitely delay federal licensing proceedings and undermine FERC's jurisdiction to regulate such matters.

> . . . .

> The record indicates that PacifiCorp's water quality certification request has been complete and ready for review for more than a decade. *There is no legal basis for recognition of an exception for an individual request made pursuant to a coordinated withdrawal-and-resubmission scheme, and we decline to recognize one that would so readily consume Congress's generally applicable statutory limit.* Accordingly, we conclude that California and Oregon have waived their Section 401 authority with regard to the Project.

913 F.3d at 1104-05 (emphasis added).

20

Thus, *Hoopa Valley* is a very narrow decision flowing from a fairly egregious set of facts, where the state agencies and the license applicant entered into a written agreement that obligated the state agencies, year after year, to *take no action at all* on the applicant's § 401 certification request. Under those facts, the D.C. Circuit rejected the parties' attempt to camouflage the "contractual idleness" through the annual withdraw-and-resubmit scheme and determined that the states had waived their certification authority under § 401.

The facts of this case, however, bear little relation to those of *Hoopa Valley*. Although McMahan twice withdrew and then immediately resubmitted its certification requests, those actions were not part of a contractual agreement for agency idleness. Indeed, there was no idleness on the part of NCDEQ. After McMahan filed its first request in 2017, NCDEQ's staff met and corresponded frequently with McMahan. They reviewed McMahan's submission and informed it that a water-quality monitoring plan would be required. They gave McMahan advice about what should be included in the monitoring plan and reviewed the plan internally when it was finally submitted. These are significant actions, and they were all taken less than a year after the certification request was filed. NCDEQ continued to take significant action after McMahan withdrew and resubmitted its applications in 2018 and 2019. During those times, NCDEQ staff continued to correspond and meet with McMahan and help in the development of the water-quality monitoring plan. Once FERC finally issued the EA of the Project, NCDEQ met with McMahan and moved forward with the statutorily mandated public-notice-and-comment process. And after that process was completed, of course, NCDEQ proceeded to grant the § 401 certification.

21

Because NCDEQ did in fact take action on McMahan's applications, FERC is forced to defend its waiver determination by arguing that § 401 requires *final* agency action within one year. That is, FERC contends that to avoid waiver, the state agency must either grant or deny certification within a year of the filing of the certification request. We are not convinced FERC's reading of the statute is correct.

Section 401 requires the state agency to *certify* or *deny* compliance with water-quality standards. The waiver portion of the statute, however, uses a different verb and provides that a state waives its certification authority if it "fails or refuses *to act* on a request for certification" within a year. 33 U.S.C.A. § 1341(a)(1) (emphasis added). If Congress had intended for the states to take final action on § 401 applications within a year of filing, the statute could have made that clear by providing that waiver occurs if the agency "fails to certify or deny compliance with water quality standards within one year." Since Congress instead hinged waiver on the agency's failure "to act" on a certification request, traditional rules of statutory construction would generally require us to interpret "acting" on a certification request as meaning something other than certifying or denying compliance with water-quality standards. *See, e.g., Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks and alteration omitted); *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) (per curiam) ("[W]here Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.").

22

If this reading of the statute is correct, a state would not waive its certification authority if it takes significant and meaningful action on a certification request within a year of its filing, even if the state does not finally grant or deny certification within that year. Such a reading of the statute would be consistent with the legislative history of the amendment to § 401 that added the waiver provision, which indicates that the review period was added to prevent States effectively vetoing federal projects by taking no action on § 401 applications. *See Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 972 (D.C. Cir. 2011) ("[T]he Conference Report on Section 401 states that the time limitation was meant to ensure that 'sheer inactivity by the State . . . will not frustrate the Federal application.'").

This understanding of the statute would also be consistent with the purposes of the Clean Water Act generally and § 401 specifically. As this court explained in *Sierra Club v. United States Army Corps of Engineers*, 909 F.3d 635 (4th Cir. 2018), the CWA reflects a "carefully prescribed allocation of authority between federal and state agencies" that preserves "'the *primary responsibilities and rights of States* to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources.'" *Id.* at 647 (quoting 33 U.S.C. § 1251(b)) (emphasis added). And while the purpose of § 401's one-year review period was to prevent States from delaying federal projects by taking no action on certification requests, the purpose behind § 401 itself and its certification requirement is "'to assure that Federal licensing or *permitting agencies* cannot override State water quality requirements.'" *Id.* (quoting S. Rep. 92–414, at 69 (1971)). Under this reading of the statute, a State that in good faith takes timely action to review and process a certification request likely would

not lose its authority to ensure that federally licensed projects comply with the State's water-quality standards, even if it takes the State longer than a year to make its final certification decision.[5]

Nonetheless, despite our reservations about FERC's reading of the statute and its approach to the waiver question, we need not definitively resolve those questions in this appeal. As we will explain, even if we accept FERC's expansive reading of *Hoopa Valley* and assume that FERC's standard for finding waiver is consistent with the plain language of the CWA, we agree with NCDEQ that FERC's key factual findings underpinning its waiver determination are not supported by substantial evidence. Accordingly, we leave the statutory-interpretation question for resolution in a case where the outcome depends on the precise meaning of the statute.

B.

FERC contends that it reasonably concluded that North Carolina waived its water-certification authority by not taking final action on McMahan's § 401 application because "(1) [NCDEQ] coordinated with McMahan, arranging for it to withdraw and resubmit its

---

[5]       We are not aware of any circuit that has adopted this interpretation of § 401. In *NY State Dep't of Env't Consv. v. FERC*, 991 F.3d 439 (2d Cir. 2021), the Second Circuit rejected this reading of the statute by concluding that the state waived its certification authority under § 401 when it asked the applicant to agree to revise the date of receipt of its certification request by 36 days in order to give the agency time to comply with the required notice-and-comment period before acting on the certification. *See id.* at 443, 447-48. However, interpreting § 401 as requiring meaningful action, but not necessarily final action, would not be inconsistent with the decision in *Hoopa Valley,* which simply held that whatever "fails or refuses to act" in § 401 means, the agencies there had not acted. *See Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1105 (D.C. Cir. 2019).

certification request on two occasions after receipt of the request, in an effort to avoid the one-year deadline, and (2) the 'resubmissions' were neither new nor significantly modified." *Brief of Respondent* at 24. FERC contends its factual findings are supported by the record and that our deferential standard of review therefore requires us to uphold the waiver finding.

Our narrow scope of review permits us to "set aside the FERC's order only if we find it to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence." *Appomattox River Water Auth.*, 736 F.2d at 1002 (4th Cir. 1984) (citation and internal quotation marks omitted); *see* 5 U.S.C. § 706(2)(A); 16 U.S.C.A. § 825*l*(b). "Substantial evidence review is an objective assessment of the sufficiency of the evidence." *Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 514 (4th Cir. 1998). When conducting this review, we must consider the "whole record" and "take into account whatever in the record fairly detracts" from the agency's factual findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *T-Mobile Ne. LLC v. City Council of City of Newport News, Va.*, 674 F.3d 380, 385–86 (4th Cir. 2012) (internal quotation marks omitted). Substantial evidence is more than a mere scintilla of evidence, but it need not be a preponderance of the evidence. *See id.* at 385.

We will assume for purposes of this opinion that FERC's approach to the issue is correct, such that a finding of waiver under § 401 is appropriate if the applicant and state agency, in order to avoid the one-year review period, coordinate on a withdrawal-and-

resubmission scheme and the resubmitted applications do not differ significantly from the withdrawn applications. After a careful review of the record and mindful of the deference to which agency decisions are entitled, we nonetheless conclude that FERC's factual findings are not supported by substantial evidence.

(1)

As previously explained, FERC concluded that NCDEQ and McMahan had agreed to a coordinated withdrawal and resubmission scheme "directed" by NCDEQ in order to avoid waiver. J.A. 439. While FERC acknowledged that McMahan "initiated" the first withdrawal, FERC was "not persuaded" the action was really a "unilateral action" by McMahan because NCDEQ had sent an email "instruct[ing] McMahan Hydro to send a letter" withdrawing and resubmitting its certification request. J.A. 645. FERC concluded that, whether or not there was a formal agreement between NCDEQ and McMahan, the "coordination" between the parties was enough to give rise to waiver under § 401. J.A. 646.

In support of its petition for rehearing, NCDEQ submitted an affidavit from Karen Higgins, who supervised the staff members reviewing McMahan's application. Higgins stated in the affidavit that

> NCDEQ never ordered or otherwise required McMahan Hydro to withdraw and resubmit [its] application. Furthermore, NCDEQ never formed any agreement with McMahan Hydro pursuant to which McMahan Hydro withdrew and resubmitted any application. Rather, it is NCDEQ's understanding that McMahan Hydro voluntarily chose to withdraw and resubmit its application, presumably based on its understanding that NCDEQ could not issue a 401 certification prior to the expiration of the one year statutory period.

26

J.A. 507-08. Although Higgins had relevant knowledge about the McMahan application, FERC dismissed her affidavit out of hand. Describing the affidavit as "stating that [NCDEQ] did not have a *formal agreement* with McMahan," FERC dismissed the affidavit as "unconvincing and irrelevant" because a formal agreement was not required to show coordination between NCDEQ and McMahan. J.A. 649 (emphasis added).

As the block quote above shows, however, Higgins did not simply say that there was no formal agreement between NCDEQ and McMahan; she specifically denied *any* type of coordination with McMahan and stated that the withdrawals and resubmissions were voluntary actions by McMahan. When presented with this legally competent and relevant evidence, FERC mischaracterized it and dismissed it as irrelevant. While FERC is the fact-finder, it cannot "arbitrarily ignore[]" "unrebutted, legally significant evidence" or "base [its] decision on only isolated snippets of that record while disregarding the rest." *Baharon v. Holder,* 588 F.3d 228, 233 (4th Cir. 2009).

Moreover, the correspondence submitted with Higgins' affidavit support her assertion that McMahan initiated the withdrawals and resubmissions. Shortly after McMahan filed its first § 401 certification application, NCDEQ requested that McMahan submit a water quality monitoring plan and the environmental assessment being prepared by FERC. McMahan responded on May 12, stating that it did not know when the environmental assessment would be available and requesting an extension of a previous deadline to permit submission of the assessment when it was released by FERC. On December 21, 2017, McMahan emailed NCDEQ the water-quality monitoring plan and also asked "to discuss refiling [the] 401 application since [McMahan] still hadn't received

27

[the] Environmental Impact Assessment from FERC." J.A. 524. NCDEQ acknowledged receipt of the monitoring plan by email on January 3, 2018, and explained that "to refile your application, you will need to send a letter stating that you would like to withdraw your application and reapply prior to March 3, 201[8]." J.A. 537.

A similar sequence of events preceded McMahan's second withdrawal and resubmission in February 2019. FERC finally issued the environmental assessment in October 2018. After reviewing the assessment, NCDEQ notified McMahan that, because of the public notice-and-comment requirements, it would not be able to issue a § 401 certification by the end of the one-year review. At a meeting in December 2018, McMahan informed NCDEQ that it intended to withdraw and resubmit its application. *See* J.A. 507-08. As part of the follow-up from that meeting, NCDEQ sent McMahan an email on February 7, 2019, stating that the agency had no further comments on the water-quality monitoring plan and reminding McMahan to "remember to send Karen a request to withdraw and reapply (I think the deadline is by February 20th)." J.A. 547.

FERC relied on the January 2018 email to support its finding of coordination regarding the first withdrawal and resubmission of the application and the February 2019 email to show coordination over the second withdrawal and resubmission. When those emails are considered in their full context, however, they simply do not support FERC's coordination finding. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998) (An agency "engaged in simple factfinding . . . is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands."). The emails do not establish that NCDEQ directed

28

McMahan to withdraw and resubmit its application or coordinated with McMahan on a scheme intended to thwart the statutory review period. Instead, the full record shows that in both instances, McMahan, for its own purposes, raised the prospect of withdrawing and resubmitting its application. NCDEQ did not broach the subject, but merely answered questions and reminded McMahan of the time frame if it intended to proceed.

Indeed, FERC has since refused to find coordination in the face of very similar evidence. In *KEI (Maine) Power*, 173 FERC ¶ 61069 (2020), FERC concluded that a withdrawal-and-resubmission by the applicant did not give rise to a waiver of the state's certification authority because the withdrawal was not done "at the behest" of the state agency. *Id.* at 61497. Instead, the purpose of the withdrawal and refiling was "to give KEI Power the opportunity to avoid receiving a certification with conditions to which it objected and instead to allow it to negotiate further to achieve an outcome to its liking." *Id.* at 61497-98. FERC reached this conclusion despite the existence of an email from the agency telling the applicant to "[s]ubmit what you have, along with the statement regarding withdraw and resubmit. Once you've withdrawn and resubmitted, you can then submit additional comments." *Id.* at 61498 (internal quotation marks omitted). FERC explained that the email

> shows that Maine DEP worked with KEI Power, but does not demonstrate that the state either encouraged or supported withdrawal and resubmittal.... While Maine DEP may have provided KEI Power information as to process, we do not find this email chain to reflect that Maine DEP sought withdrawal and resubmittal to circumvent the one-year statutory deadline for the state agency to act. Unlike instances where state agencies sent unsolicited reminder emails for licensees to withdraw and resubmit to allow the state more time to complete its processing and review, here the record reflects the genesis of the withdrawal and resubmittal to be on KEI Power.

29

*Id.*

We see no meaningful difference between the emails sent by NCDEQ in this case and the emails sent by the Maine agency in *KEI Power*, and the record is devoid of any other evidence that would support FERC's decision to draw opposite inferences from similar evidence. The correspondence from McMahan contains no hint that NCDEQ initiated or directed McMahan's withdrawal-and-resubmissions. In its February 2018 letter formally withdrawing the first application, McMahan noted FERC's delay in preparing the environmental impact assessment for the Project, but did not suggest that NCDEQ had any role in its decision. *See* J.A. 311. McMahan's second withdraw-and-resubmit letter, in February 2019, included a timeline of the application process. The letter simply states that McMahan "is withdrawing its current application, and re-applying for the 401 Certification," and goes on to note that in February 2018, "McMahan submitted a request for [NCDEQ] to withdraw and re-apply its application for a 401 Water Quality Certificate." J.A. 427. Nothing in the letter or timeline provides any basis for concluding that NCDEQ coordinated or was otherwise involved in any nefarious way with McMahan's withdrawal and resubmission of its applications for § 401 certification.

In support of its finding of coordination, FERC notes that, after McMahan's first withdrawal and resubmission in February 2018, NCDEQ told McMahan that it would not be able to issue the § 401 certification by February 2019 and that McMahan withdrew and resubmitted its application for a second time in response to that information and after a reminder email from NCDEQ. In our view, the inferences FERC is attempting to draw from this thin evidence are not reasonable.

30

As we have explained, FERC's environmental assessment of the Project was a critical part of the information NCDEQ needed to evaluate McMahan's certification request. FERC did not issue the EA, however, until the fall of 2018. After reviewing the EA, NCDEQ informed McMahan that it could not grant the certification by February 2019, in part because of public-notice requirements. NCDEQ, however, did not follow up that statement with a request that McMahan withdraw and re-apply so to give the agency more time, nor is there any other evidence in the record suggesting that NCDEQ was informally seeking McMahan's help in avoiding the one-year deadline. Absent other evidence indicating an improper motive or showing that McMahan understood the agency to be pressuring it to withdraw and resubmit the application, NCDEQ's factual statement about how long it would take to issue the certification does not support FERC's finding of improper coordination.

If NCDEQ could not have *granted* the certification by February 2019, it quite easily could have *denied* certification, which is what NCDEQ contends it would have done had McMahan not chosen to withdraw and resubmit its application. FERC has previously held that no waiver arises when an applicant withdraws and resubmits its application in the hopes of avoiding a certification that imposes unfavorable conditions. *See Village of Morrisville, Vermont*, 173 FERC ¶ 61156, 61940 (2020) ("[W]here the licensee withdraws and refiles its application in order to avoid potentially unfavorable water quality certification conditions, the licensee acts unilaterally for its own benefit and by its own initiative, which is not a sufficient basis to find waiver."); *KEI (Maine)*, 173 FERC at 61497-98 (finding no waiver where applicant unilaterally withdrew and resubmitted its

31

certification request in order "to avoid receiving a certification with conditions to which it objected and instead to allow it to negotiate further to achieve an outcome to its liking"). We see no basis for FERC to take a different approach to McMahan's withdrawals and resubmissions, given that a denial of certification prevents the granting of a federal license and thus works to the disadvantage of the applicant, perhaps even more so than the granting of § 401 certification that includes unfavorable conditions. McMahan thus withdrew and resubmitted its certification requests for the same reason as the applicants in *KEI* and *Village of Morrisville*—to avoid undesirable agency action.

The only evidence in the record addressing the full circumstances of McMahan's withdrawal of its certification applications are the affidavit and exhibits submitted by NCDEQ in support of its petition for rehearing. McMahan did not request the waiver finding during the course of the FERC licensing proceeding, nor did it object to NCDEQ's rehearing petition or submit any evidence showing that NCDEQ requested or directed McMahan to withdraw its applications. FERC, however, never grappled with this significant quantity of evidence showing that McMahan acted independently when withdrawing and resubmitting its applications. Instead, it focused primarily on two emails, stripped of all context, and dismissed all other evidence as "unconvincing and irrelevant." J.A. 649.

As we have explained, NCDEQ's emails from February 2018 and February 2019 cannot be viewed as evidence of improper coordination between NCDEQ and McMahan. Those emails—as demonstrated by the evidence that FERC declined to consider—were responses providing procedural information after McMahan stated its intention to withdraw

32

and resubmit its applications. If (as we are assuming) mere coordination between an applicant and the state agency can lead to a finding of waiver under § 401, then it must take more than routine informational emails to show coordination. Were the rule otherwise, applicants could manipulate state agencies into inadvertently waiving their certification authority just by asking questions. The States' rights and responsibilities to ensure compliance with their own water-quality standards are too important to be so easily stripped away. Accordingly, after reviewing the record as a whole, we are constrained to conclude that FERC's finding of improper coordination is not supported by substantial evidence. *See Universal Camera*, 340 U.S. at 488 ("[A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."); *Ai Hua Chen v. Holder*, 742 F.3d 171, 181 (4th Cir. 2014) (granting petition for review because the agency failed to account for strong contradictory evidence "in a meaningful way" and the agency opinion failed "to demonstrate that the agency gave [the contradictory evidence] more than perfunctory consideration").

(2)

FERC contends a relevant factor when deciding the waiver question is whether the new application filed after withdrawal included substantial changes from the application that was withdrawn. In this case, FERC argues that McMahan's resubmitted applications were identical to those withdrawn, which supports its conclusion that McMahan and

33

NCDEQ were engaged in a sham withdrawal-and-resubmit scheme to avoid the one-year review period of § 401.

Although FERC did discuss the "new application" issue in the orders issued in this case, it is apparent from the orders that the supposed coordination between McMahan and NCDEQ was the dispositive factor in its waiver finding. Indeed, FERC made this point explicitly in its recent decision in *Village of Morrisville*. In that case, FERC explained that whether the refiled applications were materially different from the original applications

> alone *is not dispositive in determining whether there is waiver. . . .* [A] state waives its certificate authority under section 401 if it deliberately circumvents the one-year deadline or agrees with the applicant to do so. If, instead, the applicant voluntarily delays the issuance of a water quality certificate by withdrawing and refiling its application, absent an agreement with the state, then waiver is not warranted, regardless of whether or to what extent the refiled application changes from the original. Here, *Morrisville by its own initiative withdrew and refiled the applications to obtain more favorable conditions and give itself more time to consider various studies and alternatives, so we need not consider the extent to which the various applications differed.*

173 FERC at 61941 (emphasis added). Accordingly, even if the applications here were identical, the dispositive issue under FERC's own standard is whether the state agency encourages the withdrawal or otherwise coordinates with the applicant on a process of withdrawing and resubmitting the applications. As we have explained, FERC's coordination finding is not supported by substantial evidence. Because the evidence does not establish coordination, FERC's waiver finding cannot be sustained even if the resubmitted applications were identical to the withdrawn applications.

V.

34

Assuming without deciding that a State may waive its certification authority under § 401 by coordinating with an applicant in a scheme to defeat the statutory review period through a process of withdrawing and resubmitting the certification application, we conclude that FERC's finding of coordination between McMahan and NCDEQ is not supported by substantial evidence. And without evidence of improper coordination, FERC erred by concluding that North Carolina waived its certification authority under § 401. Accordingly, in Case No. 20-1655, we hereby grant NCDEQ's petition for review, vacate the License Order, and remand the matter to FERC with instructions that the McMahan license be re-issued to include the conditions imposed by NCDEQ in its § 401 certification. *See* 33 U.S.C. § 1341(d).

In Case No. 20-1671, we dismiss for lack of jurisdiction that portion of PK Ventures' petition for review challenging the validity of McMahan's state applications for a § 401 certification. Finding no merit to the remaining claims, we otherwise deny PK Ventures' petition for review.

> *No. 20-1655: Petition for review granted; order vacated and remanded with instructions*
>
> *No. 20-1671: Petition for review dismissed in part and denied in part*