**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, *Petitioner*, <br><br> v. <br><br> FEDERAL ENERGY REGULATORY COMMISSION, *Respondent*, <br><br> NEVADA IRRIGATION DISTRICT, *Intervenor*. | No. 20-72432 |
| SOUTH YUBA RIVER CITIZENS LEAGUE; CALIFORNIA SPORTFISHING PROTECTION ALLIANCE; FRIENDS OF THE RIVER; MOTHER LODE CHAPTER OF THE SIERRA CLUB, *Petitioners*, <br><br> v. <br><br> FEDERAL ENERGY REGULATORY COMMISSION, *Respondent*, <br><br> NEVADA IRRIGATION DISTRICT, *Intervenor*. | No. 20-72452 <br><br> FERC Nos. 2266-102 2266-118 |

CALIFORNIA STATE WATER
RESOURCES CONTROL BOARD,
                    *Petitioner*,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent*,

YUBA COUNTY WATER AGENCY,
                    *Respondent-Intervenor*.

No. 20-72782

SOUTH YUBA RIVER CITIZENS
LEAGUE; CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE; FRIENDS OF
THE RIVER; MOTHER LODE CHAPTER
OF THE SIERRA CLUB,
                    *Petitioners*,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent*,

YUBA COUNTY WATER AGENCY,
                    *Respondent-Intervenor*.

No. 20-72800

FERC No.
2246-086

| | |
|---|---|
| CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, *Petitioner*, v. FEDERAL ENERGY REGULATORY COMMISSION, *Respondent*, MERCED IRRIGATION DISTRICT, *Respondent-Intervenor*. | No. 20-72958 FERC Nos. 2179-043 2467-020 2179-048 2467-022 |

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE; FRIENDS OF THE RIVER; SIERRA CLUB AND ITS TEHIPITE CHAPTER, *Petitioners*, v. FEDERAL ENERGY REGULATORY COMMISSION, *Respondent*, MERCED IRRIGATION DISTRICT, *Respondent-Intervenor*. | No. 20-72973 FERC No. 2179-043 OPINION |

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted May 12, 2022
Pasadena, California

Filed August 4, 2022

Before:  Paul J. Watford and Michelle T. Friedland, Circuit Judges, and Carol Bagley Amon,[*] District Judge.

Opinion by Judge Friedland

## SUMMARY[**]

### Federal Energy Regulatory Commission

The panel granted petitions for review, and vacated orders issued by the Federal Energy Regulatory Commission ("FERC") in which FERC held that the California Water Resources Control Board (the "State Board") had waived its authority to ensure that certain hydroelectric projects complied with state water quality standards.

Section 401 of the Clean Water Act requires states to provide a water quality certification before a federal license or permit can be issued for activities that may result in any discharge into intrastate navigable waters. Under Section 401, states may impose conditions on federal licenses for hydroelectric projects to ensure that those projects comply with state water quality standards. States must act on a request for water quality certification within one year of

---

[*] The Honorable Carol Bagley Amon, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

receiving it to avoid waiving their Section 401 certification authority.

In three FERC orders, FERC found that the State Board had engaged in coordinated schemes with the Nevada Irrigation District, the Yuba County Water Agency, and the Merced Irrigation District ("Project Applicants") to delay certification and to avoid making a decision on their certification requests. According to FERC, the State Board had coordinated with the Project Applicants to ensure that they withdrew and resubmitted their certification requests before the State's deadline for action under Section 401 in order to reset the State's one-year period to review the certification requests. FERC held that, because of that coordination, the State Board had "fail[ed] or refuse[d] to act" on requests and therefore had waived its certification authority under Section 401 of the Clean Water Act. *See* 33 U.S.C. § 1341(a)(1).

The panel held that FERC's findings of coordination were unsupported by substantial evidence. Instead, the evidence showed only that the State Board acquiesced in the Project Applicants' own unilateral decisions to withdraw and resubmit their applications rather than have them denied. The panel held that, even assuming that FERC's "coordination" standard was consistent with the statute, the State Board's mere acquiescence in the Project Applicants' withdrawals-and-resubmissions could not demonstrate that the State Board was engaged in a coordinated scheme to delay certification. Accordingly, FERC's orders could not stand. The panel remanded for further proceedings.

**COUNSEL**

Jennifer Kalnins Temple (argued), Adam L. Levitan, Kristin K. McCarthy and Julia K. Forgie, Deputy Attorneys General; Eric M. Katz, Supervising Deputy Attorney General; Robert W. Byrne, Senior Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, Los Angeles, California; for Petitioner California State Water Resources Control Board.

Julie Gantenbein (argued), Water and Power Law Group PC, Berkeley, California; Andrew M. Hawley, Western Environmental Law Center, Seattle, Washington; for Petitioners South Yuba River Citizens League, California Sportfishing Protection Alliance, Friends of the River, and Sierra Club and its Mother Lode and Tehipite Chapters.

Jared B. Fish (argued), Attorney; Robert H. Solomon, Solicitor; Matthew R. Christiansen, General Counsel; Federal Energy Regulatory Commission, Washington D.C.; for Respondent Federal Energy Regulatory Commission.

Michael A. Swiger (argued), Michael F. McBride, and Ani Esenyan, Van Ness Feldman, LLP, Washington, D.C.; for Respondent-Intervenors Nevada Irrigation District and Yuba County Water Agency.

Thomas M. Berliner and Jolie-Anne S. Ansley, Duane Morris LLP, San Francisco, California; Phillip R. McMurray, General Counsel, Merced Irrigation District, Merced, California; for Respondent-Intervenor Merced Irrigation District.

Jonathan D. Brightbill and Lauren Gailey, Winston & Strawn LLP, Washington, D.C.; Andrew R. Varcoe and

Stephanie A. Maloney, United States Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

Andrea W. Wortzel, Troutman Pepper Hamilton Sanders LLP, Richmond, Virginia; Charles R. Sensiba and Morgan M. Gerard, Troutman Pepper Hamilton Sanders LLP, Washington, D.C.; for Amici Curiae National Hydropower Association and Northwest Hydroelectric Association.

Gabrielle Gurian and Kelly Thomas Wood, Assistant Attorneys General; Robert W. Ferguson, Attorney General; Office of the Attorney General, Olympia, Washington; Jill Lacedonia, Assistant Attorney General; William Tong, Attorney General; Office of the Attorney General, Hartford, Connecticut; Scott W. Boak; Aaron M. Frey, Attorney General; Office of the Attorney General, Augusta, Maine; Gillian Wener; Dana Nessel, Attorney General; Office of the Attorney General, ENRA Division, Lansing, Michigan; Peter N. Surdo, Special Assistant Attorney General; Keith Ellison, Attorney General; Office of the Attorney General, Saint Paul, Minnesota; Kristina Miles, Deputy Attorney General; Andrew J. Bruck, Acting Attorney General; Office of the Attorney General, Environmental Permitting and Counseling, Trenton, New Jersey; William Grantham, Assistant Attorney General; Hector Balderas, Attorney General; Office of the Attorney General, Consumer and Environmental Protection Division, Albuquerque, New Mexico; Taylor H. Crabtree and Asher P. Spiller, Assistant Attorneys General; Daniel S. Hirschman, Senior Deputy Attorney General; Joshua S. Stein, Attorney General; Department of Justice, Raleigh, North Carolina; Paul Garrahan, Attorney-in-Charge; Ellen F. Rosenblum, Attorney General; Natural Resources Section, Department of Justice, Salem, Oregon; Laura B. Murphy; Thomas J.

Donovan, Jr., Attorney General; Office of the Attorney General, Montpelier, Vermont; Brian R. Caldwell; Karl A. Racine, Attorney General; Public Advocacy Division, Washington, D.C.; Turner H. Smith, Deputy Chief; Matthew Ireland, Assistant Attorney General; Maura Healey, Attorney General; Office of the Attorney General, Environmental Protection Division, Boston, Massachusetts; Donald D. Anderson, Deputy Attorney General; David C. Grandis, Chief, Environmental Section; Mark R. Herring, Attorney General; Office of the Attorney General, Richmond, Virginia; for Amici Curiae States of Washington, Connecticut, Maine, Michigan, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, Vermont, the District of Columbia, and the Commonwealths of Massachusetts and Virginia.

**OPINION**

FRIEDLAND, Circuit Judge:

Section 401 of the Clean Water Act gives states the authority to impose conditions on federal licenses for hydroelectric projects to ensure that those projects comply with state water quality standards.  In these consolidated cases, we consider several petitions for review of decisions by the Federal Energy Regulatory Commission ("FERC") holding that the California Water Resources Control Board (the "State Board" or "State Water Board") waived that authority for certain hydroelectric projects in federal relicensing proceedings.  FERC found that the State Board had engaged in coordinated schemes with the Nevada Irrigation District, the Yuba County Water Agency, and the Merced Irrigation District (collectively, the "Project Applicants") to delay certification and to avoid making a decision on their certification requests.  FERC held that, because of that coordination, the State Board had "fail[ed] or refuse[d] to act" on the requests and had therefore waived its certification authority.  *See* 33 U.S.C. § 1341(a)(1).  We hold that FERC's findings of coordination are unsupported by substantial evidence.  We therefore grant the petitions for review and vacate FERC's orders.

**I.**

**A.**

The Clean Water Act provides that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States" to "prevent, reduce, and eliminate pollution" and to "plan the development and use (including restoration, preservation, and enhancement) of land and water resources."  33 U.S.C. § 1251(b).  To achieve

those goals, Congress has enacted a scheme of cooperative federalism that gives states an important role in regulating water quality. "The states remain, under the Clean Water Act, the 'prime bulwark in the effort to abate water pollution.'" *Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991) (quoting *United States v. Puerto Rico*, 721 F.2d 832, 838 (1st Cir. 1983)).

As relevant here, Section 401 of the Clean Water Act "requires States to provide a water quality certification before a federal license or permit can be issued for activities that may result in any discharge into intrastate navigable waters." *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 707 (1994) (citing 33 U.S.C. § 1341). States may adopt water quality standards that are more stringent than federal law requires, and any limitation included in the state certification becomes a condition on any federal license. *Id.* at 705, 708. That certification process is "essential in the scheme to preserve state authority to address the broad range of pollution" that might affect water quality. *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 386 (2006).

To prevent a state from "indefinitely delaying a federal licensing proceeding by failing to issue a timely water quality certification," Section 401 includes a deadline by which the state must act to avoid waiving its certification authority. *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 972 (D.C. Cir. 2011). The relevant statutory language reads:

> If the State . . . fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection

shall be waived with respect to such Federal application.  No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence.  No license or permit shall be granted if certification has been denied by the State.

33 U.S.C. § 1341(a)(1).     FERC, through regulations governing hydropower licensing proceedings and through agency adjudication, has interpreted the "reasonable period of time" for action under Section 401 to be the statutory maximum of one year from the receipt of the request. 18 C.F.R. §§ 4.34(b)(5)(iii), 5.23(b)(2); *Const. Pipeline Co.*, 162 FERC ¶ 61,014, at P 16 (Jan. 11, 2018).

The consequences of a waiver are potentially significant. Federal licenses for hydroelectric projects can last up to fifty years, and the default term is forty years.[1]  16 U.S.C. § 799; Policy Statement on Establishing License Terms for Hydroelectric Projects, 82 Fed. Reg. 49501, 49503 (Oct. 26, 2017).  Accordingly, if a state waives its authority to impose conditions on a hydroelectric project's federal license through Section 401's certification procedure, that project may be noncompliant with prevailing state water quality standards for decades.

California's criteria for issuing water quality certifications often make it impracticable for a certification to issue within one year of a project applicant's submitting

---

[1] If a project's initial license expires while the relicensing process is ongoing, FERC may issue annual, interim licenses under the same terms and conditions as the initial license.  16 U.S.C. § 808(a)(1); 18 C.F.R. § 16.18.

its request.    The main cause of delay appears to be California's requirement, pursuant to the California Environmental Quality Act ("CEQA"), that the State Board receive and consider an analysis of a project's environmental impact before granting a certification request.[2] *See* Cal. Pub. Res. Code § 21100(a) (requiring completion of "an environmental impact report on any project . . . that may have a significant effect on the environment"); Cal. Code Regs. tit. 23, § 3856(f) ("[T]he [Section 401] certifying agency shall be provided with and have ample time to properly review a final copy of valid CEQA documentation before taking a certification action."). California law assigns a "lead agency" (here, the Project Applicants) to prepare the CEQA evaluation and designates a "responsible agency" (here, the State Board) that must "consider[] the [evaluation] prepared by the lead agency" and decide "whether and how to approve the project involved."[3]  Cal. Code Regs. tit. 14, § 15096(a).  For complex projects like the ones at issue here,

---

**[2]** After FERC issued the waiver orders challenged here, the California legislature authorized the State Board to issue certifications before completion of CEQA review where failure to issue the certification "poses a substantial risk of waiver of the state board's certification authority" under Section 401.    Cal. Water Code § 13160(b)(2); *see also* 2020 Cal. Stat. 1379.  The new provision directs the State Board, "[t]o the extent authorized by federal law," to "reserve authority to reopen and . . . revise the certificate" as necessary after CEQA review is eventually completed.  Cal. Water Code § 13160(b)(2).  Because that amendment took effect after the events at issue here, it has no bearing on our analysis.

**[3]** In cases like ours, where the project applicant is a public agency, the project applicant is the "lead agency" that must complete the CEQA evaluation.  By contrast, in cases where the project applicant is a private entity, the State Board is both the "lead agency" and the "responsible agency" and, accordingly, must complete the CEQA process itself.  *See* Cal. Code Regs. tit. 14, § 15051.

the CEQA process itself can often take more than a year to complete.  If the materials required for CEQA are not submitted until late in the State Board's Section 401 review period, the State Board is unlikely to be ready to issue a certification within the one-year deadline.[4]  If the project applicants do not give the State Board a sufficient opportunity to "receive and properly review the necessary environmental documentation" under CEQA by the end of the review period, California regulations require the State Board to "deny without prejudice certification . . . unless the applicant in writing withdraws the request for certification." *Id.* tit. 23, § 3836(c).

Because it is often not feasible for a Section 401 certification to issue within one year of its submission, a practice has developed over the last several decades—in California and in other states—whereby project applicants withdraw their requests for certification before the end of the one-year review period and resubmit them as new requests, rather than have their original requests denied.  The theory behind this practice is that a withdrawn-and-resubmitted request starts a new one-year review period, affording the project applicant more time to comply with procedural and substantive prerequisites to certification and the state more time to decide whether and under what conditions it will grant the certification request.  Although FERC expressed misgivings in some orders that withdrawal-and-resubmission could lead to delays in federal licensing, FERC

---

[4] FERC used to "deem the one-year waiver period to commence when the certifying agency found the request acceptable for processing," but it has since departed from that interpretation. *See California ex rel. State Water Res. Control Bd. v. FERC*, 966 F.2d 1541, 1552 (9th Cir. 1992).  Apparently as a result, submitting a Section 401 certification request in California does not require the project applicant to provide all the materials that the State Board will eventually need for final approval.

accepted the withdrawal-and-resubmission practice for many years. *See, e.g.*, *Barrish & Sorenson Hydroelectric Co.*, 68 FERC ¶ 62,161, 64,258 (Aug. 12, 1994) (noting that the applicant "withdrew and refiled" its Section 401 request the day before the one-year review deadline); *Bradwood Landing LLC*, 126 FERC ¶ 61,035, at P 24 n.26 (Jan. 15, 2009) (observing that the project applicant's withdrawal-and-resubmission of its request for certification from the state of Oregon "restarted the statutory one-year period" for the state certifying agency); *Const. Pipeline Co.*, 162 FERC ¶ 61,014, at P 23 (Jan. 11, 2018) ("We reiterate that once an application is withdrawn, no matter how formulaic or perfunctory the process of withdrawal and resubmission is, the refiling of an application restarts the one-year waiver period under section 401(a)(1)."), *reh'g denied*, 164 FERC ¶ 61,029, at P 17 (July 19, 2018) (reaffirming that conclusion).

In 2019, however, the D.C. Circuit held that California and Oregon had waived their certification authority by entering a formal contract with a project applicant to delay federal licensing proceedings through the continual withdrawal-and-resubmission of the applicant's certification requests. *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019). The court held that the states' engagement in a "coordinated withdrawal-and-resubmission scheme" constituted a "failure" or "refusal" to act under the meaning of Section 401. *Id.* at 1104–05. In response to *Hoopa Valley*, FERC changed its position. In a series of orders, including those at issue here, FERC concluded that states had waived their Section 401 certification authority by coordinating with project applicants on the withdrawal-and-resubmission of Section 401 certification requests, even in the absence of an explicit contractual agreement to do so.

**B.**

These petitions for review challenge three orders issued by FERC holding that California waived its authority to issue water quality certifications for the Yuba-Bear Project (operated by the Nevada Irrigation District[5]), the Yuba River Project (operated by the Yuba County Water Agency), and the Merced River and Merced Falls Projects (together, the "Merced Projects") (operated by the Merced Irrigation District).  We now summarize the relevant facts underlying each of those three orders.

**1.**

In 1963, FERC issued the Nevada Irrigation District ("NID") a fifty-year license to operate the Yuba-Bear Hydroelectric Project on the Middle Yuba, South Yuba, and Bear Rivers, in Sierra, Placer, and Nevada Counties, California.  In 2011, two years before the license expired, NID applied for a renewal of the license, as required by statute.  The relicensing application is still pending,[6] and since the original license expired in 2013, NID has operated the Yuba-Bear Project on interim, annual licenses under the original license terms.[7]  Because FERC licensed the Yuba-Bear Project before the enactment of Section 401, those

---

[5] The word "Nevada" in Nevada Irrigation District refers to Nevada County, California.

[6] Licensing, Federal Energy Regulatory Commission, http://www.ferc.gov/licensing (follow hyperlink entitled "Pending License, Relicense, and Exemption Applications" (updated July 15, 2022)).

[7] *See supra* note 1.

interim licenses are not subject to state-imposed conditions under a Section 401 water quality certification.

On March 15, 2012, NID submitted a request for water quality certification to the State Board. The request stated that "NID intends to be the Lead Agency for the purpose of compliance with the requirements of [CEQA], and will coordinate with the [State] Board and other responsible agencies." The State Board acknowledged receipt of the request, confirmed that the request met the state's filing requirements, and notified NID that the request was pending before the State Board. The State Board reminded NID that, "[a]lthough a final CEQA document is not required for [a] complete application for certification, CEQA requirements must be satisfied before the State Water Board can issue certification."

NID apparently never prepared the CEQA evaluation required by California regulations. According to a status report sent by the State Board to FERC, the State Board was still "[a]waiting commencement of [the] CEQA process by [NID]" as of December 2019, more than seven years after NID submitted its initial certification request.

On March 1, 2013—two weeks before the State Board's deadline to act on the certification request—NID filed a letter with the State Board withdrawing and resubmitting its application for water quality certification. NID reiterated its intent to act as the lead agency for CEQA purposes. The State Board acknowledged receipt of the withdrawal-and-resubmission and stated: "The new deadline for certification action is February 28, 2014."

Soon after, FERC issued a draft of its own environmental impact statement, as required by federal law. The draft noted NID's withdrawal-and-resubmission and the State Board's

new February 2014 deadline to act on the certification request. The State Board submitted comments on the draft, including both substantive comments on various water quality concerns and comments attempting to clarify the expected timeline for a Section 401 certification. The latter set of comments stated:

> The CEQA process has not started, and will not be finished by the spring of 2014. The most likely action will be that the Licensees will withdraw and resubmit their respective applications for water quality certification before the one year deadline if the State Water Board is not ready to issue its water quality certifications. Otherwise, the State Board will deny certification without prejudice.

As noted above, NID never prepared a CEQA evaluation. Instead, it continued to withdraw and resubmit its certification request each year, for the five years between 2014 and 2018. In response to each withdrawal-and-resubmission, the State Board acknowledged receipt and conveyed the new deadline for certification action.

In 2019, on the day the D.C. Circuit decided *Hoopa Valley*, the State Board denied without prejudice NID's last request for Section 401 certification. In the letter notifying NID of the denial, the State Board explained that "[w]ithout completion of the CEQA process, the State Water Board cannot issue a certification." NID then sought a declaratory order from FERC that the State Board had waived its Section 401 certification authority.

FERC granted NID's request, holding that the State Board had waived its certification authority for the Yuba-

Bear Project.  FERC reasoned that, although *Hoopa Valley* had involved a formal contract between the parties to defer certification and delay federal licensing proceedings, "an explicit agreement to withdraw and refile is not necessary" to a finding of waiver.  Rather, evidence of a "functional agreement" or evidence of "the state's coordination with the licensee" would suffice to show that the state had "fail[ed] or refuse[d] to act" under Section 401.  Turning to the evidence in the instant case, FERC first noted that the State Board had consented to NID's decision to continually withdraw and resubmit its certification requests rather than issue a denial.  As evidence of the State Board's coordination in a withdrawal-and-resubmission scheme, FERC pointed to the State Board's comments on FERC's draft environmental impact statement, quoted above, describing the State Board's expectation that NID would withdraw and resubmit its request.  FERC also asserted that California regulations "codify" the withdrawal-and-resubmission practice.  Finally, FERC found it "[t]elling[]" that the State Board had "failed to dispute NID's repeated statements" in its withdrawal-and-resubmission letters that "the Board had all of the information it needed to act."

**2.**

The administrative record underlying FERC's Yuba River Project order is similar to the record from the Yuba-Bear Project.  In 1963, FERC issued the Yuba County Water Agency ("YCWA") a fifty-year license to operate the Yuba River Development Project on the Yuba, North Yuba, and Middle Yuba Rivers in Sierra, Yuba, and Nevada Counties.  YCWA filed an application for a new license in June 2017.  As with the Yuba-Bear Project, the Yuba River Project has been operating under interim, annual licenses while its

relicensing application is pending, and those interim licenses are not subject to state-imposed Section 401 conditions.[8]

On August 24, 2017, YCWA submitted a request for water quality certification to the State Board and affirmed its role as the lead agency for CEQA compliance. The State Board acknowledged receipt of the request and stated that the deadline for certification action was one year later.

On July 25, 2018, a month before the end of the one-year review period, a member of the State Board's staff emailed YCWA to remind it of the upcoming deadline. The email stated:

> YCWA's water quality certification action date for the Yuba River Development Project (FERC No. 2246) is August 24, 2018. A final CEQA document for the Project has not been filed; therefore, the State Water Board cannot complete the environmental analysis of the Project that is required for certification.
>
> Please submit a withdraw/resubmit of the certification application as soon as possible. Let me know if you have any questions.

YCWA responded that it planned to submit the withdrawal-and-resubmission letter on August 20. The State Board staff member replied: "My management usually gets a little antsy when our action date gets below 3 weeks because a 'deny without prejudice' letter takes time to route to our Executive

---

[8] *See supra* notes 1 & 6.

Director.    If possible, please submit the letter by next Friday."

On August 3, 2018, YCWA filed a withdrawal-and-resubmission letter with the State Board, reiterating its intent to act as the lead agency for CEQA purposes.  The State Board acknowledged receipt of the withdrawal-and-resubmission letter and stated: "The new deadline for certification action is August 3, 2019."

Like NID, YCWA apparently never prepared a CEQA evaluation.  A State Board status report to FERC indicated that it was still "[a]waiting commencement of [the] CEQA process by YCWA" in December 2019.  After the D.C. Circuit decided *Hoopa Valley*, the State Board denied without prejudice YCWA's resubmitted request for certification, relying on YCWA's failure to begin the CEQA process.  YCWA then sought a declaratory order from FERC that the State Board had waived its Section 401 certification authority.

FERC concluded that the State Board had waived its certification authority for the Yuba River Project, employing essentially the same reasoning as in its Yuba-Bear Project order.  This time, FERC found evidence of coordination in the email exchange between the State Board's staff member and YCWA, reasoning that YCWA's "withdrawal and refiling of its application was in response to the [State] Board's request that it do so."  FERC asserted that "[t]he coordination" demonstrated by that exchange "alone [was] sufficient evidence that the [State] Board sought the withdrawal and resubmittal of the Yuba River application to circumvent the one-year statutory deadline for the state agency to act."  As in the Yuba-Bear Project order, FERC also pointed to California's "codification" of the withdrawal-and-resubmission practice in its regulations and

to the State Board's failure to "dispute Yuba County's statements that . . . the [State] Board had all of the information it needed to act."

## 3.

The administrative record underlying FERC's Merced Projects order resembles the administrative records from the Yuba-Bear and Yuba River Projects. In 1963 and 1969, respectively, FERC issued licenses to the Merced Irrigation District ("MID") to operate the Merced River Hydroelectric Project for a fifty-year term and to its predecessor licensee, Pacific Gas and Electric Company ("PG&E"), to operate the Merced Falls Hydroelectric Project for a forty-five-year term. The Merced Projects are located on the Merced River in Merced and Mariposa Counties. As with the Yuba-Bear and Yuba River Projects, the Merced Projects are currently operating under interim, annual licenses while relicensing is pending.[9]

On May 20 and May 21, 2014, MID and PG&E[10] submitted to the State Board requests for water quality certifications for the Merced Projects. The State Board acknowledged receipt of the requests, conveyed the one-year deadline for action, and warned that, "[i]f the information necessary for compliance with CEQA is not provided to the

---

[9] *See supra* notes 1 & 6.

[10] PG&E transferred its license for the Merced Falls Project to MID in 2017, making MID the applicant in the relicensing proceeding before FERC. For the Merced Falls Project, between the initial certification request in 2014 and the license transfer in 2017, it was the State Board—not PG&E—that was the lead agency for the purpose of CEQA compliance.

State Water Board, staff may recommend denial of certification without prejudice."

In April 2015, one month before the original one-year deadline, a State Board member emailed MID to remind it of the upcoming deadline. The email stated:

> Merced Irrigation District's application for water quality certification for the Merced River Hydroelectric Project, FERC Project No. 2179[,] expires on May 21, 2015. Please withdraw the [sic] and simultaneously resubmit an application for water quality certification prior to May 13, 2015. If you have any questions regarding this request or this process, please feel free to contact me. Please respond by email verifying receipt of this correspondence.

MID apparently never prepared the CEQA evaluation required by California regulations—the State Board said in a status report to FERC that it was still "[a]waiting commencement of [the CEQA] process" for both Merced Projects in December 2019. Instead, each year between 2015 and 2018, MID and PG&E withdrew and resubmitted their water quality certification requests before the expiration of the State Board's one-year period of review. In response, the State Board acknowledged receipt of the withdrawal-and-resubmission letters, conveyed the new deadlines for certification action, and warned that failure to comply with CEQA could result in denial of certification without prejudice.

After the D.C. Circuit decided *Hoopa Valley*, the State Board denied without prejudice MID's resubmitted requests for certification, relying on MID's failure to comply with

CEQA. MID then sought a declaratory order from FERC that the State Board had waived its Section 401 certification authority.

FERC concluded that the State Board had waived its certification authority for the Merced Projects, again using nearly identical reasoning as in its Yuba-Bear Project and Yuba River Project orders. In particular, FERC pointed to "the four years of the applicants['] withdrawing and resubmitting their applications" and to the April 2015 email from the State Board staff member to MID as evidence that the State Board had engaged in a coordinated scheme to continually reset its one-year deadline and avoid taking action on the certification request. As in the other orders, FERC noted that California's regulations "codify" the withdrawal-and-resubmission practice and highlighted the State Board's failure to "request additional information regarding the [Section 401 requests.]"

**\* \* \***

In sum, in all three challenged orders, FERC held that the Project Applicants' withdrawals-and-resubmissions of their Section 401 certification requests did not restart the State Board's one-year review clock because the State Board "coordinated" with the Project Applicants in a scheme to avoid deciding the request within the statutory deadline.

The State Board and various environmental organizations timely petitioned our court for review of all three orders.

## II.

"We review FERC decisions to determine whether they are 'arbitrary, capricious, an abuse of discretion,

unsupported by substantial evidence, or not in accordance with the law.'" *California ex rel. Harris v. FERC*, 784 F.3d 1267, 1272 (9th Cir. 2015) (quoting *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 910 (9th Cir. 2003)). "[S]ubstantial evidence constitutes more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. If the evidence is susceptible of more than one rational interpretation, we must uphold [FERC's] findings." *Fall River Rural Elec. Coop. v. FERC*, 543 F.3d 519, 525 (9th Cir. 2008) (second alteration in original) (quoting *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1076 (9th Cir. 2003)). Although we must accept reasonable inferences drawn by an agency, "[s]ubstantial evidence cannot be based upon an inference drawn from facts which are uncertain or speculative and which raise only a conjecture or a possibility." *Woods v. United States*, 724 F.2d 1444, 1451 (9th Cir. 1984).

## III.

As noted above, FERC changed its position on withdrawal-and-resubmission following the D.C. Circuit's decision in *Hoopa Valley*. *Hoopa Valley* concerned a series of dams along the Klamath River in California and Oregon that were operated by PacifiCorp pursuant to a federal license. 913 F.3d 1099, 1101 (D.C. Cir. 2019). As PacifiCorp's license was due to expire, PacifiCorp asked FERC to relicense the upper dams and decommission the lower dams. *Id.* PacifiCorp requested Section 401 certifications from California and Oregon. *Id.* While those requests were pending, a consortium of parties—including PacifiCorp, the two states, and various other interested groups—entered negotiations to address certain risks associated with decommissioning the lower dams. *Id.* Those negotiations culminated in a formal agreement, in

which the states promised that they would not take any action on the certification requests and PacifiCorp promised to withdraw and resubmit them annually as necessary to preserve the states' certification authority. *Id.* at 1101–02. The goal of that arrangement was to pause federal licensing proceedings until PacifiCorp had satisfied various preconditions for decommissioning specified in the agreement, including adopting interim environmental measures and securing federal funds for the project. *Id.* Pursuant to the agreement, PacifiCorp's water quality certification requests remained undecided by California and Oregon even though they "ha[d] been complete and ready for review for more than a decade." *Id.* at 1105.

The Hoopa Valley Tribe, which was not a party to the contractual agreement and whose reservation is downstream of the dams, petitioned FERC for a declaratory order that California and Oregon had waived their Section 401 certification authority. *Id.* at 1102. FERC declined to find a waiver, *id.*, in keeping with its long-held position that the withdrawal-and-resubmission procedure restarted a state's one-year review period. The D.C. Circuit disagreed, concluding that California and Oregon had demonstrated "deliberate and contractual idleness" by "shelving water quality certifications" pursuant to the "coordinated withdrawal-and-resubmission scheme" required by the parties' contractual agreement. *Id.* at 1104–05. Accordingly, the court held that the states had failed or refused to act on the certification requests within one year and had therefore waived their certification authority under Section 401. *Id.*

Following *Hoopa Valley*, FERC began finding waiver in many cases where project applicants had withdrawn and resubmitted certification requests. FERC has applied *Hoopa*

*Valley* not only to cases involving express agreements to delay certification through withdrawal-and-resubmission, like the agreement at issue in *Hoopa Valley* itself, but also to cases involving what FERC has deemed more informal, coordinated schemes. *E.g.*, *McMahan Hydroelectric, LLC*, 168 FERC ¶ 61,185, at P 37 (Sept. 20, 2019), *vacated by N.C. Dep't of Env't Quality v. FERC (NCDEQ)*, 3 F.4th 655 (4th Cir. 2021); *Placer Cnty. Water Agency*, 167 FERC ¶ 61,056, at P 12 (Apr. 18, 2019).

In defining its standard for waiver, FERC draws a line between a "coordinated" scheme and a "unilateral" withdrawal-and-resubmission by the project applicant. In its brief to our court, FERC takes the position that "an applicant's unilateral withdrawal and resubmittal is not imputed to the State" and therefore does not trigger a waiver. Ordinarily, FERC acknowledges, "[o]nce an applicant withdraws a request, it is not clear that the State retains power to act on it"; the withdrawal of the request removes it from the state's consideration, and the resubmission of the certification request begins a new one-year review period. Accordingly, where the evidence shows that the state has merely acquiesced in a project applicant's own decision to withdraw and refile—and, especially, where the state would have no discernible motive for attempting to procure a withdrawal-and-resubmission—FERC's position is that the state has not waived its certification authority. *See, e.g.*, *Village of Morrisville*, 174 FERC ¶ 61,141, at P 22 (Feb. 24, 2021) ("[The Vermont certifying agency's] mere acceptance of Morrisville's requests to withdraw and refile is not evidence of a functional agreement between the parties with the motivation to restart the one-year clock."), *modifying on reh'g* 173 FERC ¶ 61,156 (Nov. 19, 2020).

By contrast, FERC contends that "where the State coordinates in an applicant's withdrawal of its request, the State has affirmatively 'fail[ed] or refus[ed] to act' on it within one year," and thus waived its Section 401 certification authority. FERC emphasizes that "it is a State's efforts to avoid the one-year deadline by way of withdrawal and resubmittal that reflect the '*State's* dalliance or unreasonable delay.'" (quoting *Hoopa Valley*, 913 F.3d at 1104). In other words, according to FERC, "the dispositive factor" is whether the state coordinates with the project applicant "to afford itself more time to decide a certification request." Under that standard, where the state has sought a withdrawal-and-resubmission for its own purposes— perhaps, for example, because it lacks an adequate basis to deny certification but needs more time to craft certification conditions—the state has engaged in a coordinated scheme to avoid the one-year deadline for action.

We need not decide whether the coordination standard FERC advances is consistent with the text of Section 401 because we agree with the State Board and the environmental organizations that FERC's findings of coordination are not supported by substantial evidence in the record.[11]    Instead, the evidence shows only that the State

---

[11] Because the Environmental Protection Agency ("EPA") is charged with administering the Clean Water Act, including Section 401, EPA's interpretations of the Act, rather than FERC's, are entitled to deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 972 (D.C. Cir. 2011). In 2020, after the events at issue here, EPA promulgated a final rule interpreting the waiver provision in Section 401 for the first time, and EPA has since proposed a new rule that would revise and replace the 2020 rule. *See* 40 C.F.R. pt. 121 (codifying Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42210 (July 13, 2020)); Clean Water Act Section 401 Water Quality Certification

Board acquiesced in the Project Applicants' own decisions to withdraw and resubmit their applications rather than have them denied.[12]

In the Yuba-Bear Project order, FERC relied almost entirely on comments that the State Board submitted in response to FERC's draft environmental impact statement. As described above, those comments stated: "The CEQA process has not started . . . .  The most likely action will be that [NID] will withdraw and resubmit . . . .  Otherwise, the State Water Board will deny certification without prejudice." From those comments, FERC concluded that NID had not "acted voluntarily and unilaterally" in withdrawing and resubmitting its certification request because the State Board "expected NID to withdraw and refile its application."

Far from showing that the State Board coordinated a scheme to delay a decision on certification, the State Board's comments (which were not even conveyed directly to NID) show merely that the State Board predicted that NID would decide to withdraw and resubmit.  The State Board observed that NID had not started the CEQA process and that, as a result, "[t]he most likely action" was that NID would withdraw and resubmit its request.  The statement describes the State Board's prediction but gives no indication that the

---

Improvement Rule, 87 Fed. Reg. 35318 (proposed June 9, 2022) (to be codified at 40 C.F.R. pts. 121, 122, & 124).  We need not consider EPA's interpretations of Section 401 because they apply only prospectively and because, in any event, we do not reach the statutory-interpretation issue.

[12] Because we vacate FERC's orders on substantial-evidence grounds, we also do not reach the State Board's arguments that FERC's "coordination" standard cannot be applied retroactively either under *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971), or under *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322 (9th Cir. 1982).

State Board was working to engineer that outcome.  Indeed, the State Board went on to say that it was fully prepared to "deny certification without prejudice" if NID took a different course.  The comments do not suggest that the State Board was motivated to delay certification by way of withdrawal-and-resubmission.[13]

FERC's order ignored the import of other evidence in the record that furnishes crucial context: It was NID that had failed to comply with CEQA, and thus it was NID—not the State Board—that apparently had a motive for delay.  If, conversely, NID had complied with its legal obligations under state law, then statements like those quoted above might suggest that the State Board was seeking to extend its own decision-making window by instructing NID to withdraw and resubmit the application.  Here, though, the comments indicate only that the State Board predicted that NID would withdraw its application because of NID's own failure to comply with CEQA—and that the State Board would deny the certification request without prejudice if

---

[13] FERC speculates in its brief that the State Board might have preferred withdrawal-and-resubmission because, unlike a denial without prejudice, the withdrawal-and-resubmission might not be subject to judicial review in state court.  There is no evidence in the record that the State Board was motivated to avoid judicial review.  And, in any event, the parties have given us no reason to believe that a state-court challenge to such a denial would have succeeded, given that the Project Applicants had not submitted the materials required by CEQA.  *See* Cal. Code Regs. tit. 23, § 3836(c) (providing that, in the absence of required CEQA documentation, "the certifying agency shall deny without prejudice certification for any discharge resulting from the proposed activity"); *Turlock Irrigation Dist.*, 174 FERC ¶ 61,042, at PP 31-33 (Jan. 19, 2021) (noting that state law governs the validity of the State Board's action to deny certification pursuant to state water quality standards), *petition for review denied by Turlock Irrigation Dist. v. FERC*, 36 F.4th 1179 (D.C. Cir. 2022).

NID chose not to withdraw it, as state law would have required, *see* Cal. Code Regs. tit. 23, § 3836(c). In short, the State Board's comments show only that it consented to NID's own decision to withdraw and resubmit its certification requests.

The evidence supporting FERC's waiver finding in the Yuba River Project order is similarly inadequate. FERC relied almost exclusively on an email exchange between a member of the State Board's staff and YCWA, in which the staff member reminded YCWA that the "final CEQA document for the Project has not been filed" and asked YCWA to "[p]lease submit a withdraw/resubmit of the certification application as soon as possible." The staff member noted in a follow-up email that the reason for the urgency was that "a 'deny without prejudice' letter takes time to route to our Executive Director."

Considered in context, those emails do not support FERC's finding of coordination. Because YCWA had not complied with CEQA, the State Board could not grant a Section 401 certification. Cal. Code Regs. tit. 23, § 3836(c). The staff member's request that YCWA send a withdrawal-and-resubmission letter merely reflected his prediction that YCWA would choose the withdrawal-and-resubmission path rather than have its certification denied by the Board. After all, the withdrawal-and-resubmission mechanism had become a standard practice employed by project applicants who had not yet complied with CEQA—a practice that both the State Board and FERC had long accepted. The follow-up email confirms that understanding. The State Board was prepared to deny certification but wanted to prepare such a denial before the deadline if YCWA chose not to withdraw; from the State Board's perspective, withdrawal-and-resubmission and denial without prejudice were functional

substitutes that would have had the same practical effect. Like the State Board's comments on the Yuba-Bear Project, the State Board's communication here shows only that the State Board acquiesced in YCWA's own decision to withdraw its requests.

Finally, in the Merced River Project order, FERC again relied primarily on a single email from the State Board, which, for similar reasons, cannot support FERC's waiver finding. The email asked that MID "[p]lease withdraw the [sic] and simultaneously resubmit an application for water quality certification prior to" the deadline.[14] Once again, context is critical to understanding the message: MID had not complied with its obligation to furnish the CEQA documents required by state law. For that reason, the State Board anticipated that MID would withdraw and resubmit its certification request, as was the common practice, and accepted MID's decision to do so. Nothing in the record suggests that the State Board was unprepared to deny the requests in accordance with state regulations if MID chose not to withdraw and resubmit, *see* Cal. Code Regs. tit. 23, § 3836(c), or that the State Board had any motive to delay a certification decision by coordinating a withdrawal-and-resubmission.

---

[14] As noted above, *see supra* note 10, the State Board was the lead CEQA agency for the Merced Falls Project before PG&E transferred its license to MID. FERC has not offered a similar email or any other evidence that might support a waiver determination for the Merced Falls Project; nor has FERC argued that the State Board's initial role provides a basis for treating the Merced Falls Project differently from the Merced River Project. *See United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015) (en banc) ("Generally, an appellee waives any argument it fails to raise in its answering brief.").

Indeed, for all three projects, it seems that the State Board, unlike the Project Applicants, would have had an interest in moving along the environmental-review process. The Project Applicants were operating under interim, annual licenses that were not subject to state-imposed water quality conditions. *See supra* notes 1 & 6. Completing the Section 401 certification process would have allowed the State Board to impose conditions on any eventual new license. The evidence shows that, for all three projects, the State Board was at least actively engaged in relicensing proceedings by, for example, participating in the pre-application process to design the necessary environmental studies, submitting comments on FERC's draft environmental analyses, and providing regular status updates to FERC on pending certification requests. The Project Applicants, by contrast, stood to benefit from any delays because a Section 401 certification likely would have imposed additional environmental-protection measures. *See Turlock Irrigation Dist. v. FERC*, 36 F.4th 1179, 1183 n.6 (D.C. Cir. 2022) (noting that applicants operating under interim, annual licenses have "an incentive to delay" because their expired, decades-old licenses "presumably include[] far fewer environmental conditions" than current law requires).

FERC's remaining evidence is no more persuasive. In all three orders under review, FERC pointed to the serial withdrawals-and-resubmissions themselves. But, as FERC's own position recognizes, "an applicant's unilateral withdrawal and resubmittal is not imputed to the State." Even under FERC's interpretation of the statute, the mere fact that withdrawals-and-resubmissions occurred cannot demonstrate that the State Board was engaged in a coordinated scheme to delay certification.

FERC also observed in all three waiver orders that California's regulations "codify [the] practice" of withdrawal-and-resubmission—and, in its brief to our court, FERC offers those regulations as additional evidence that the State Board directed the Project Applicants to withdraw their certification requests.   FERC is wrong to describe California's regulations as "prescribing withdrawal as a response to the impending risk of federal waiver."   Those regulations instead state that, where a project applicant has failed to comply with CEQA, "the certifying agency *shall deny without prejudice certification* for any discharge resulting from the proposed activity unless the applicant in writing withdraws the request for certification."  Cal. Code Regs. tit. 23, § 3836(c) (emphasis added).[15]  The most that can be said about the regulations is that they acknowledge applicants' longstanding practice—accepted by FERC for decades—of withdrawing and resubmitting Section 401 certification requests to avoid having them denied for failure to comply with state environmental-review requirements.

Finally, all three orders also relied on the State Board's alleged failure to dispute statements by the Project Applicants "that the Board had all of the information it needed" or to request additional information.  FERC's orders mischaracterize the record.  The State Board never disputed that the Project Applicants had met the minimum filing requirements to *submit* a Section 401 certification request. But the State Board continually reminded NID, YCWA, and MID that it did not have the information it would need to

---

[15] As mentioned above, *see supra* note 2, the California legislature recently amended state law to permit the State Board to issue a Section 401 certification without a final CEQA evaluation under certain circumstances.  We express no view on how that amendment might affect the operation of this regulation going forward.

*grant* a request—namely, the CEQA evaluation that California law required, Cal. Code Regs. tit. 23, § 3856(f).

In short, the records in all three orders under review demonstrate that the Project Applicants chose to withdraw and resubmit their certification requests because they had not complied with California's CEQA regulations. Without a complete CEQA evaluation, the State Board was legally obligated to deny the requests without prejudice, and the record suggests that the State Board was prepared to do so. To avoid such a denial, the Project Applicants employed the common and long-accepted withdrawal-and-resubmission maneuver, with the State Board's acquiescence.[16] We note that, if the Project Applicants had preferred not to undertake withdrawal-and-resubmission, they could have declined to do so, forced the State Board to deny their certification requests, and, if they believed the denials were unwarranted, challenged them in state court. The Project Applicants chose

---

[16] Although it appears that, from the State Board's perspective, withdrawal-and-resubmission and denial without prejudice were functionally equivalent, the Project Applicants apparently had reasons to prefer withdrawal-and-resubmission. At oral argument, FERC suggested that "there are risks that come with a denial" for the applicant, suggesting that a denial might "affect[] their investor decisions" and could also "imperil their federal license." Oral Argument at 33:01-33:16. The latter concern apparently stems from the fact that a denial without prejudice might signal to FERC that the project applicant is not diligently pursuing Section 401 certification—which could constitute grounds for dismissal of the federal licensing application, *see Turlock Irrigation Dist.*, 174 FERC ¶ 61,042, at PP 37-38 (Jan. 19, 2021). The Project Applicants confirmed at oral argument that they preferred to avoid denials without prejudice: "You say denial without prejudice, but denial is denial no matter what label you put on it. Then the applicants would have been in the position of deciding whether they had to appeal or not, if they didn't appeal, whether they might be estopped from appealing in the future." Oral Argument at 52:50-53:12.

not to take that path—and nothing in the record shows that the State Board encouraged that choice.  Under FERC's own coordination standard, a state's mere acceptance of a withdrawal-and-resubmission is not enough to show that the state engaged in a coordinated scheme to avoid its statutory deadline for action.  Accordingly, FERC's orders cannot stand.

The Fourth Circuit recently reached the same conclusion in a case with similar facts.  *See NCDEQ*, 3 F.4th 655.  In that case, FERC had also found waiver based on email correspondence from the certifying agency reminding the project applicant of the deadline for withdrawal-and-resubmission.  *Id.* at 662–64.  The Fourth Circuit vacated FERC's order, concluding that, even "[a]ssuming without deciding that a State may waive its certification authority under [Section] 401 by coordinating with an applicant in a scheme to defeat the statutory review period through a process of withdrawing and resubmitting the certification application," the correspondence between the certifying agency and the project applicant was not substantial evidence of coordination.  *Id.* at 676.

We agree with the Fourth Circuit's observation in *NCDEQ* that "it must take more than routine informational emails to show coordination" because the states' "rights and responsibilities to ensure compliance with their own water-quality standards are too important to be so easily stripped away."  *Id.* at 675.  Because the default term of a federal license is forty years, a state's waiver could result in a hydroelectric project's being noncompliant with a state's standards for decades.  Considering those dramatic consequences, FERC's coordination findings cannot rest on such thin evidence as a simple courtesy email reminding an applicant of an impending deadline.

## IV.

For the foregoing reasons, we conclude that FERC's orders are not supported by substantial evidence. We therefore **VACATE** those orders and **REMAND** for further proceedings consistent with this opinion.